GRAVES & LEAVITT
JOHN J. GRAVES, JR., ESQ.
NEVADA BAR NO. 1698
601 SOUTH SIXTH STREET
LAS VEGAS, NEVADA  89101
702-385-7277 (PHONE)
702-385-1178 (FAX)
GRAVESLEAVITT@AOL.COM

ROBERT A. NERSESIAN
NEVADA BAR NO. 2762
NERSESIAN & SANKIEWICZ
528 SOUTH EIGHTH STREET
LAS VEGAS, NEVADA  89101
TELEPHONE:  702-385-5454
FACSIMILE:  702-385-7667
VEGASLEGAL@AOL.COM

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **CHENTILE GOODMAN**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:11-CV-01447-RCJ-CWH |
| ) | |
| **LAS VEGAS METROPOLITAN POLICE** ) | |
| DEPARTMENT, a political subdivision ) | |
| of the State of Nevada**; COSMOPOLITAN** ) | |
| **INTERNATIONAL COMPANY, INC.**, a ) | |
| Nevada Corporation; **NEVADA PROPERTY** ) | |
| **1, LLC**, a foreign limited liability Company; ) | |
| **JOHN SEGURA, JAMES SIGNORELLO,** ) | |
| AND DOES 1-30; and ROES 1-30; jointly ) | |
| and severally, ) | |
| ) | |
| Defendants. ) | |

## AMENDED COMPLAINT FOR DAMAGES

COMES NOW, plaintiff, Chentile Goodman, by and through her attorneys, John J.

Graves, Jr., Esq., and Nersesian & Sankiewicz, for her claim for relief against the Defendants,

and each of them, alleges as follows:

1

## GENERAL AND JURISDICTIONAL ALLEGATIONS COMMON TO ALL CLAIMS

1.      Plaintiff is an individual who lives and works in Clark County, Nevada.

2.      Defendants are all either Nevada residents, Nevada entities, conduct regular and systematic business in the County of Clark, State of Nevada, or a sub-division of the State of Nevada, or work for the corporations or political subdivision of the State of Nevada.

3.      Defendant, Nevada Property 1, LLC (hereafter Cosmopolitan), owns and operates a hotel/casino on the Las Vegas Strip known as "The Cosmopolitan" also referred to as Cosmopolitan.

4.      Defendants, Does 1-30 and Roes 1-30 are individuals and entities, the names of whom are not known to plaintiff, who participated in the actions causing plaintiff injury as described below, or participants in the conspiracy and/or concerted action alleged below, who are, as coconspirators or co-tortfeasors, liable for damages and punitive damages due plaintiff as participants in the conspiracy even though they may or may not have undertaken direct actions against this plaintiff.  Plaintiff will seek leave to amend to name these defendants as their names are determined. These defendants include:

        a)      The police officers or detectives employed by the Las Vegas Metropolitan Police Department on the date of the incident at the Cosmopolitan, one referred to as "Segura" by persons present and hereafter referred to by that name as well, and a second officer or detective who worked with him that night (hereafter "Signorello"), both of whom detained and falsely imprisoned plaintiff.  On information and belief, both Las Vegas Metropolitan Police officers worked in the 'vice' division, and the identification identified them as officers with this force.  Each was also apparently 'undercover,' as they wore street clothes.

        b)      The individual security agents who worked in or around the room where plaintiff was detained for two (2) hours at the Cosmopolitan.

c)      Any person in a supervisory position that directed the other defendants to undertake the tortious actions against plaintiff as further described below.

5.      At all times herein mentioned the individual defendants, including all defendants sued under fictitious names, were agents or employees working on behalf of their respective employers while acting within the scope and course of their agency and employment.

6.      On or about February 9, 2011, a friend of plaintiff (Ayda Maseser ("Ayda")), flew into Las Vegas for one night to visit with plaintiff.  Ayda was picked up by plaintiff at the airport about 10:20 P.M., and the two young women drove to the Cosmopolitan to rent a room.  No rooms were available, and plaintiff and Ayda rented a room at Aria.

7.      Before checking in at the Aria, the women walked to the high limit tables at Cosmopolitan to say hello to plaintiff's boyfriend and his business partner.  Plaintiff and Ayda then walked to the Aria, checked in, and got dressed for a night out in Las Vegas. The plan was to meet her boyfriend and his business partner for a late dinner and drinks at Cosmopolitan.

8.      After getting dressed, plaintiff and Ayda left for an errand, and then went to the Cosmopolitan to meet plaintiff's boyfriend and his business partner.

9.      Plaintiff and Ayda parked in valet and entered the Cosmopolitan.  Plaintiff texted her boyfriend in his hotel room, and told him to meet them at "The Henry", a venue within the Cosmopolitan.

10.     While proceeding towards The Henry within the Cosmopolitan, both plaintiff and Ayda walked in an unassuming and non-suspicious manner towards the location where plaintiff's boyfriend was to meet up with plaintiff and Ayda.

11.     While proceeding towards The Henry and while conversing amongst themselves, plaintiff and Ayda were approached by defendant, John Segura ("Segura").

12.     Segura interrupted their conversation and began making overtures in the nature of a common masher on the make.  He stated things like he was looking for a good time and seeking out the party spot in town.  He, for example, asked the plaintiff if she knew where any good parties were, or knew where he might go to meet some interesting people for some 'fun' while he was in town.

13.     Plaintiff did her best to ignore and discourage Segura, repeatedly answering his questions curtly while not even looking at him, and making it clear that she and Ayda were about other business and that Segura should leave them alone.  In this respect, a hooker would invite Segura to party or some other such response, but plaintiff's statements were merely to the effect that there were plenty of good clubs in town and Segura could go try them.  As Segura's mashing continued, plaintiff eventually completely ignored him clearly indicating that she and Ayda were done communicating with him.  At no time did Plaintiff or Ayda invite or allude to a desire for any further interaction with Segura or provide any basis for him to conclude that they were prostitutes.

14.     Segura ignored plaintiff's attempts to have him not bother them, and continued to attempt to engage the plaintiff and Ayda in conversation at a personal level, which attempts were rebuffed.  Segura then appeared insulted by the fact that he was all dressed up working vice, and two attractive women at a casino would not give him the time of day or otherwise show any interest in his entreaties.  Indeed, the fact that he was rebuffed in his overtures to the plaintiff and Ayda appear to be the only motivating factor for the actions described below, and Segura, in having his manhood challenged, and Signorello, in assistance of Segura, exhibited malice and oppression, and even fraud (in accusations made in the presence of others) throughout the balance of the encounter in an apparent attempt to punish plaintiff for not recognizing Segura's self-perceived and apparently self-inflated attractiveness to women.

15.     Signorello then joined Segura and together they stopped plaintiff and Ayda, identified themselves as police, and demanded identification of plaintiff and Ayda.

16.     Regardless of no basis to undertake a detention, plaintiff and Ayda did not object, complied with the request for the identification, and in response to a question concerning their then current activities, explained to Segura and Signorello that they were on their way to a dinner at The Henry with some friends.

17.     Plaintiff and Ayda had done nothing, and were not doing anything, that would provide any level of suspicion of criminal activity, let alone any reasonable suspicion, and Segura and Signorello had no legal basis to detain or otherwise confront plaintiff and Ayda in a *Terry* stop.  Nevertheless, Segura's demand for identification coupled with show of force indicated to the plaintiff that she was not free to walk away.

18.     After complying with the request of Segura and Signorello, plaintiff and Ayda made it clear that they desired to proceed on their way to their prearranged dinner.

19.     On information and belief, once the identifications of plaintiff and Ayda were in their possession, Segura and Signorello radioed for a scope on plaintiff and Ayda.

20.     A scope of plaintiff showed that there were no outstanding warrants and no meaningful criminal or arrest history with respect to plaintiff.  With respect to Ayda, on information and belief, a single past arrest was shown on the scope, and no prosecution or conviction of any meaningful crime was present.

21.     At that point Segura and Signorello held the following information with respect to plaintiff:

    a.   She was walking in the Cosmopolitan;

    b.   She was conversing with another person who had a nominally checkered past according to the scope of Ayda;

5

c.  She was dressed in a fashion that was, in a word, sexy, yet not in any way inordinate for a young woman out for an evening in Las Vegas;

d.  She had no meaningful history of arrests or criminal activity;

e.  She had been cooperative when approached by Segura and Signorello; and

f.  She had explained that she was meeting her boyfriend and that they, together with Ayda, were going to partake of dinner for the balance of the night.

There was no further information concerning plaintiff.

22.    Despite the lack of any meaningful information, Segura and Signorello restricted plaintiff and Ayda from leaving thusly undertaking a detention without any reasonable suspicion of criminal activity, or articulable facts supporting suspicion (let alone probable cause).

23.    Segura and Signorello then informed plaintiff that she must accompany them, and made this request showing legal authority and color of law through their status as police officers and their demeanor and language which firmly and undeniably indicated that plaintiff had no choice and must accompany Segura and Signorello.  The lack of choice was also confirmed as Segura and Signorello, and later the personnel in the employ of Cosmopolitan working with the police, refused a simple request by the plaintiff to allow her to contact her boyfriend and let him know of her whereabouts.

24.    Segura and Signorello then escorted plaintiff, despite objections and manifestations of innocence from anything that should or could draw the attention of Segura and Signorello, to an area well outside the immediate vicinity of the place where the detention of plaintiff was first effected, to wit:  The security office of Cosmopolitan.

25.    At the security office of Cosmopolitan it was readily apparent to plaintiff and the other detainees that the police defendants and the security personnel at Cosmopolitan were so familiar with each other, and the practices of each other, that they even felt comfortable using nicknames.  Further, Segura and Signorello acted in such a way in respect to the

6

1   Cosmopolitan personnel on site, and vice versa, that it was readily apparent to plaintiff that
2   the circumstances to which she was being subjected were common and repeat occurrences as
3   between the local police and Cosmopolitan personnel on site, and were even repeated later
4   when Segura and Signorello escorted other persons to be held by Cosmopolitan security
5   personnel into the holding room.  In short, it was apparent that Cosmopolitan provided a
6   holding cell complete with guards for the Las Vegas Metropolitan Police in general, and for
7   Segura and Signorello on the night in question, and that it did so willingly and in full
    cooperation with the police such that persons were held in handcuffs for hours manacled to
8   secure places within Cosmopolitan's security office.  This all occurred absent any warrant for
9   arrest, post seizure by the police of the persons being held, away from the immediate area
10  where the persons were seized by the police, in a fashion concerning both duration and
11  circumstances that indicated that Cosmopolitan acted as an adjunct to the police, and in patent
12  violation of the requirement that the persons be presented immediately for booking or to a
13  magistrate to determine the legality of their seizure and detention.

14

15  26.     At times during the detention of plaintiff, Segura and Signorello were not present
16  although the detention of plaintiff was continuing.  At such times plaintiff was in the apparent
17  exclusive control and detention of Doe defendants in the employ of Cosmopolitan.  During
18  such periods plaintiff requested to leave, and was refused by Cosmopolitan security
19  personnel.

20

21  27.     At such times as referenced in the preceding paragraph the Doe defendants were
    acting in concert with Segura and Signorello, and assisting them in the seizure and detention
22  of the plaintiff and others.  In fact, while the plaintiff was present in the security office, and
23  throughout her presence, a number of other persons whose words indicated that they were
24  prostitutes, were being held by Cosmopolitan and had been delivered to the security office by
25  Segura and/or Signorello thereby affirming and demonstrating Cosmopolitan's willing
26  participation in the actions of Segura and Signorello as well as further demonstrating that
27  Cosmopolitan acted as an arm of the police in providing a holding cell for the police.  Some
28  of these other persons who were apparently familiar with the appearances and demeanor of

7

prostitutes also repeatedly informed Cosmopolitan that plaintiff and Ayda were obviously not prostitutes, and Cosmopolitan personnel present confirmed that they agreed with such statements and recognized that the plaintiff and Ayda were not prostitutes.

28.     During the seizure and again during the detention of the plaintiff by the defendants, Segura with the acquiescence of Signorello, and Signorello with the acquiescence of Segura informed plaintiff that she was going to be arrested for various crimes largely surrounding allegations of prostitution.  Cosmopolitan personnel confirmed these statements and confirmed that the detention was essentially undertaken in order to fill a paddy-wagon rather that provide individual transports.  These statements by Segura and Signorello were made in the presence of third persons, and were also gratuitous in the sense that even if they were true, there was no reason to make the statements in the presence of third parties.  Further, at the time the statements were made, Segura and Signorello knew that there was no reasonable suspicion of prostitution on the part of plaintiff, likely knew that after a period of detention (when the paddy-wagon arrived) that plaintiff and Ayda would be released, and certainly knew that there was no probable cause to arrest plaintiff for prostitution.

29.     The statements of Segura and Signorello were of a nature that they imparted the understanding to all present that plaintiff was a criminal and also impugned plaintiff's chastity without reason or basis.

30.     Plaintiff was not, is not, and has never been a prostitute, and had committed no crime nor undertaken any actions which would support a seizure at any level.

31.     At the end of a period approaching two hours, plaintiff was released by defendants, no charges were ever proffered against plaintiff, and despite the earlier prospective promise that they were going to arrest plaintiff, plaintiff was never arrested and charged, but only arrested, seized, and released without review by a magistrate or other process instituted against her.

32.     During the events described herein, Segura and Signorello did physically attack plaintiff in forcibly removing her cell phone from her hand and by grabbing her arm as part and parcel of detaining plaintiff and taking plaintiff to the security office at Cosmopolitan.

33.     Pursuant to NRS 171.123, Segura and Signorello were absolutely prohibited from removing Plaintiff from the immediate vicinity of the place where the detention of plaintiff was first effectuated, but did so nonetheless.  The security office is not in the immediate vicinity of the place where the detention was first effectuated.

34.     Pursuant to NRS 171.123, even if Segura and Signorello had reasonable cause to suspect that criminal activity was afoot (which they did not), Segura and Signorello were absolutely prohibited from detaining Plaintiff for a period of time in excess of one hour, yet did so nonetheless.  Moreover, even if there were grounds for a *Terry* stop, the allowable duration of a *Terry* stop is limited by reason, and for the time approaching two hours in which plaintiff was detained, Segura and Signorello did not gain any further information regarding plaintiff, and for a period of over an hour prior to release, did not even seek out any other information regarding plaintiff.  In this respect, assuming a valid *Terry* stop (which is contrary to the facts), over an hour of plaintiff's detention remained a constitutionally prohibited seizure by defendants.

35.     During the detention security employees of Cosmopolitan became aware and verbally recognized that the detention of plaintiff by Segura, Signorello, and Cosmopolitan was without legal authority and questioned Segura and Signorello regarding the detention.  In response to the questions, neither Segura or Signorello could articulate any basis for Cosmopolitan's continuing seizure of the plaintiff, and it was clear to the Cosmopolitan personnel, and others within the room, that the seizure of plaintiff was without basis (even some other detainees present in the room verbally challenged the detention of the plaintiff stating to Cosmopolitan personnel that there appeared to be no basis to detain the plaintiff).  Despite the ready recognition that the detention of plaintiff was being fostered in an extra-

legal manner by Segura and Signorello, Cosmopolitan personnel continued to cooperate with Segura and Signorello in the detention of plaintiff.

36.     Despite the recognized illegality of the detention by Cosmopolitan and its personnel, without compulsion as Segura and Signorello would be gone for extended periods attempting to elicit solicitations for sex from women about the Cosmopolitan with Cosmopolitan's blessing, Cosmopolitan and its personnel continued to assist and partake in the detention of plaintiff and to cooperate with Segura and Signorello in their seizure which was necessarily recognized by Cosmopolitan personnel to be for a reason other than legitimate police reasons. At times while plaintiff was in the exclusive custody of Cosmopolitan personnel thusly establishing their confinement of plaintiff as well, Cosmopolitan showed and exhibited their control by keeping plaintiff away from her personal property and refusing plaintiff's requests to use her phone to let others know of her whereabouts.

37.     In a further show of support of Segura and Signorello in the unwarranted detention and confinement of plaintiff, upon being released with no charges proffered or probable cause shown or alluded to, Cosmopolitan and its personnel issued plaintiff a warning to not trespass under NRS 207.200, and even though she was clearly the victim of tortious and illegal action by Segura, Signorello, and Cosmopolitan and its personnel, gratuitously foisted further punishment upon plaintiff in excluding her from their premises without any colorable reason or rationale. For their own dossier, thereby also taking personal advantage of plaintiff's detention, Cosmopolitan also took plaintiff's photograph and included it in a trespass record where plaintiff was listed (without legitimate reason) as an undesirable.

38.     For the two hours in which plaintiff was detained Cosmopolitan personnel together with Segura and Signorello acted in concert in detaining plaintiff and taking the other actions stated herein.

39.     While detained by Segura and Signorello, plaintiff also explained that her boyfriend would be waiting at The Henry for her, and begged Segura and Signorello and Cosmopolitan

personnel to confirm her wholly legitimate purpose for being at Cosmopolitan through merely going to The Henry, finding the boyfriend, and confirming plaintiff's itinerary for the evening. All the defendants ignored this incredibly reasonable request, and the fact that Segura and Signorello ignored the request further demonstrates that there was no intent or desire to investigate anything concerning plaintiff, and the detention of the plaintiff was for some twisted perception of an insult held by Segura and acted upon by all defendants.

40.     Despite the ease with which such investigation could have been undertaken, the lack of probable cause or reasonable suspicion, and the exculpatory indicators such a limited and unobtrusive investigation would disclose, Segura and Signorello ignored plaintiff's reasonable requests and eschewed the most basic of investigations that would have been undertaken by any reasonable police officer in like or similar circumstances.

41.     From the number of such detentions that have resulted in women being detained but not charged, or detained for in excess of an hour in the confines and custody of casino security without being arrested (in violation of NRS 171.123) the Las Vegas Metropolitan Police Department necessarily recognizes that the extra-constitutional and extra-statutory detentions of persons meeting the above-referenced character is occurring, and rather than correct the problem, have gone so far as to solicit and encourage the casino industry inclusive of Cosmopolitan to continue and assist in such illegal policies.

42.     Also as a practice employed by Southern Nevada law enforcement officers is the regular activity of having casinos provide security facilities to hold persons seized on evidence that would, at best, constitute a basis for a *Terry* stop, or like this case, not even reach such a level, while the state authorities continue an investigation secure in the knowledge that the cooperating casino security department will not upset the illegal detention of the person.

43.     Cosmopolitan's head of security regularly attends a meeting of security chiefs with Las Vegas Metropolitan Police Department participation where cooperation between the

security departments of the casinos on the Las Vegas Strip and the police are discussed and general agreements are made.  At such meetings the security chiefs are told that their security forces should be viewed as an extension of law enforcement and schooled in the importance and expectation of unquestioned cooperation with requests of police officers.  At such meetings the general agreement to provide non-critical cooperation is received from the security chiefs.

44.     Also while in custody of Cosmopolitan and the police defendants, plaintiff's purse was taken by Segura, Signorello, and the personnel of the Cosmopolitan to a place outside the access of Plaintiff even though there were not articulable facts providing any concern of plaintiff being armed or dangerous.  The defendants also rifled (searched) the contents of the plaintiff's purse at that stage without plaintiff's consent.  Further, at variance with the continued detention by all defendants, the search of plaintiff's purse did not disclose any contraband and further exonerated plaintiff from any connection with prostitution.

45.     Plaintiff had provided no indication to the defendants that she was in any way armed or dangerous, and no reasonable police officer acting in like or similar circumstances could point to any fact or factor providing an articulable basis for believing that they were in danger of a possibly armed plaintiff.

46.     Despite the foregoing, without warrant or cause, some individual doe defendants, inclusive of Cosmopolitan personnel, searched or participated in the search, of plaintiff's purse.

47.     The detention and confinement of Plaintiff was of such a nature, considering the foregoing, that no reasonable police officer acting in like or similar circumstances:

    a.   Would have seized plaintiff and continued to seize or enlist others in the continued seizure of the plaintiff;

    b.   Would have asported plaintiff to a point away from the initial contact;

    c.   Would have held plaintiff for any appreciable time in a security office;

12

    d.  Would have threatened plaintiff with arrest;

    e.  Would have failed to follow-up concerning plaintiff's proximate boyfriend;

    f.  Would have seized plaintiff's telephone and/or prevented plaintiff from using her telephone; or

    g.  Would have secured and/or searched plaintiff's purse.

48.    Pursuant to NRS § 201.354, prostitution is a misdemeanor.

49.    Due to the activities of the defendants, plaintiff has suffered the following damages:

    a.  Physical discomfort and suffering;

    b.  Outrage;

    c.  Humiliation,

    d.  Embarrasment;

    e.  Emotional distress and mental suffering;

    f.  Loss of reputation,

    g.  Fear and dread;

    h.  Loss of life's enjoyment;

    i.  Loss of liberty; and

    j.  Loss of the plans for the evening which, minimally, would have included dinner and drinks in an amount in excess of $100.00;

All in an amount in excess of $10,000.00.

## FIRST CAUSE OF ACTION-FALSE IMPRISONMENT/FALSE ARREST

50.    Plaintiff incorporates herein and makes a part thereof Paragraphs 1 through 49, inclusive, of plaintiff's General Allegations the same as though said Paragraphs were set forth herein in full.

51.    Plaintiff was a guest at Cosmopolitan, and was present at that business on February 10, 2011.

52.     The actions of defendants, and each of them, in detaining and confining plaintiff on the date above in the Cosmopolitan security area was without legal authority, and was accompanied by force and threats against plaintiff.

53.     That this restraint of freedom was against plaintiff's will, over her protest, and defendants, and each of them, intended to seize, restrain and confine plaintiff.

54.     The legal authority of a gaming licensee in Nevada to detain an individual is expressed in statutes, and limited to a private person arrest (NRS 171.126), suspicion of a gaming offense (NRS 465.101), or suspicion on reasonable cause of a felony committed by the individual (NRS 171.1235).

55.     Pursuant to NRS 171.126, the legal authority to conduct a private person arrest is limited to a crime actually committed or attempted in the presence of the private person, when the person arrested has actually committed a felony, or when a felony has actually been committed and the arresting person has reasonable cause to believe that the person arrested committed the felony.

56.     That Cosmopolitan's detention of the plaintiff was without legal authority, and constitutes false imprisonment because none of the bases for detention under ¶¶ 54 or 55 existed with respect to the plaintiff, and plaintiff was detained against her will by Cosmopolitan.

57.     The legal authority for a police officer to detain an individual in Nevada is expressed in statutes and is limited to a citizen's arrest as described above (NRS 171.126), an arrest by a peace officer (NRS 171.124), for an offense committed in the officers presence (NRS 171.124), when the person arrested has actually committed a felony or gross misdemeanor (NRS 171.124), when the officer has reasonable cause to believe that the person has committed a felony or gross misdemeanor (NRS 171.124), on a charge made on reasonable

cause that the person detained has committed a felony or gross misdemeanor (NRS 171.124), pursuant to a warrant (NRS 171.124), when the officer encounters the person detained under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a crime (NRS 171.123), or when the officer encounters the person detained in circumstances which reasonably indicate that the person has violated or is violating the conditions of the person's parole or probation (NRS 171.123). Additionally, the constitutional limits on detaining an individual are circumscribed by reasonable suspicion based on articulable facts, and the constitutional restriction on detaining a person beyond a brief investigatory stop require probable cause to believe that the detainee was about to commit a crime, in the process of committing a crime, or had committed a crime.

58.     Any detention pursuant to NRS 171.123 is also limited to one hour unless culminating in an arrest, and is only allowed to be at the place or the immediate vicinity of the place where the detention was first effected, unless the person is arrested.

59.     In moving plaintiff beyond the immediate vicinity of the place of detention and participating in the continuing detention of the plaintiff for more than an hour, Segura and Signorello arrested the plaintiff (*see State v. McKellips*, 49 P.3d 655, 660 (Nev. 2002)), and as noted through application of the strictures in ¶ 58, this was an arrest without probable cause and without legal authority. Further, the fact that the seizure was of the nature of an arrest thusly imposing all Fourth Amendment protections is also confirmed by these facts.

60.     The restraint, confinement, and detention of plaintiff was undertaken with oppression, fraud, and malice.

61.     That defendants are all guilty of acts of oppression, fraud, or/and malice, in causing injury to plaintiff, and undertook such actions with a conscious disregard for the rights of the plaintiff subjecting plaintiff to cruel and unjust hardship in conscious disregard of plaintiff's rights, for which defendants, should be assessed damages in excess of $10,000 each as punitive or exemplary damages.

62.     As a result of the false imprisonment of plaintiff, she has been injured and damaged in an amount in excess of $10,000 in general and punitive damages.

63.     Plaintiff, requests legal interest of defendants, from the date of the filing of this Complaint with the Court, as well, costs, and a reasonable attorney's fee from defendants, and each of them.

### SECOND CAUSE OF ACTION- BATTERY

64.     Plaintiff incorporates herein and makes a part thereof ¶¶ 1 through 63, above as though said allegations were set forth herein in full.

65.     That defendants, Las Vegas Metropolitan Police Department, by and through its agents Segura and Signorello did subject plaintiff to an unlawful touching of her body through force and violence by forcibly grabbing and removing her cellular telephone from her hand without probable cause or reason on the night in question, grabbing her arm, and forcibly removing her to a place of seclusion and confinement, without plaintiff's consent or authorization.

66.     That these touchings (batteries) were initiated in a false manner, and were continued in an oppressive way.  In this respect, the police defendants taunted the plaintiff throughout her seizure with promises of incarceration, accusations of harlotry, and other insults, and otherwise appeared to intentionally direct words towards plaintiff with no other purpose than to instill severe emotional distress in the plaintiff.  This is especially true because they knew there were no charges going to be filed against plaintiff, and that plaintiff would be released, following their foray into some sort of 'street-justice' foisted on plaintiff for rebuffing Segura's advances.

67.     That plaintiff has been damaged as set forth above by these unlawful and improper touchings in the manner set forth above in an amount in excess of $10,000.

68.     That defendants, Las Vegas Metropolitan Police Department and its individual detectives/officers, have been guilty of acts of oppression, fraud, and/or malice, in causing injury to plaintiff, and such conduct and misrepresentations as aforesaid were carried on by the defendants, Las Vegas Metropolitan Police Department, and its individual detectives/officers, with a conscious disregard for the rights of plaintiff, subjecting plaintiff to cruel and unjust hardship in conscious disregard of her rights, for which defendants, Las Vegas Metropolitan Police Department and its detectives/officers, should be assessed damages in excess of $10,000 each as punitive or exemplary damages.

69.     Plaintiff, requests legal interest of defendants, from the date of the filing of this Complaint with the Court, as well, costs, and a reasonable attorney's fee from defendants, and each of them.

## THIRD CAUSE OF ACTION - 42 U.S.C. § 1983 VIOLATION

70.     Plaintiff incorporates herein and makes a part thereof ¶¶ 1 through 69, as though said Paragraphs were set forth herein in full.

71.     The agents of the Las Vegas Metropolitan Police Department (inclusive of doe defendants Segura and Signorello), a subdivision of the State of Nevada, officers and detectives, with the advice and encouragement each to the other, actually and proximately caused the detention and confinement of plaintiff without probable cause or even reasonable suspicion, and thereafter continuing seizure, detention and confinement, thereby subjecting plaintiff to the deprivation of rights, privileges and immunities guaranteed to her under the Fourth and Fourteenth Amendments to the United States Constitution, and in so doing, agents of the Las Vegas Metropolitan Police Department as yet unknown, inclusive of Segura and Signorello (to be added as defendants upon identification), are liable under 42 U.S.C. § 1983 for the proximate injuries to plaintiff described above.

72.     These rights, privileges and immunities included the right to be free of the seizure of her person, and detention and confinement of her person, beyond a *Terry* stop, except upon

17

probable cause, which never existed, the right to be free of a detention associated with a *Terry* stop due to the lack of any reasonable suspicion of criminal activity based on articulable facts, the right to be free of unreasonable searches associated with the invasion of plaintiff's purse, and the right to be free of unreasonable seizures of property concerning the seizure of plaintiff's purse and cell phone.

73.     In acting in concert with the police defendants in the detention and search of the plaintiff, Cosmopolitan and its personnel also committed the detention, continuing seizure, and confinement referenced above under color of law (i.e., with state action), and are correlatively liable under 42 U.S.C. 1983 for the torts committed against plaintiff.

74.     If any grounds ever existed for the detention or confinement of the plaintiff, such grounds were repeatedly and firmly dispelled early in the interaction between plaintiff and defendants, and the continued detention and confinement of plaintiff thusly violated her constitutional rights as well.

75.     That as a direct and proximate result of the conduct of the defendants, plaintiff has suffered damages as set forth above.  Additionally, pursuant to 42 U.S.C. § 1988, plaintiff is entitled to the costs of suit inclusive of a reasonable attorney's fee.

76.     That defendants acted with oppression and malice in the seizure and continued detention of the plaintiff, and undertook the actions aforesaid directed at plaintiff beyond all norms and mores of civilized society.  In this respect, the actions of the defendants were undertaken with a conscious disregard for the rights of the plaintiff thusly subjecting plaintiff to cruel and unjust hardship in conscious disregard of plaintiff's rights, for which defendants are liable to plaintiff for damages in excess of $10,000 each, as punitive or exemplary damages.

/ / /

/ / /

**FOURTH CAUSE OF ACTION – DEFAMATION**

77.     Plaintiff incorporates herein and makes a part thereof ¶¶ 1 through 76 above as though said allegations were set forth herein in full.

78.     That in their oral comments to plaintiff within the security office of the Cosmopolitan, in their conduct toward her in the presence of each other, Cosmopolitan employees, and third persons also present in the Cosmopolitan security office, defendants "Segura" and Signorello did defame plaintiff in calling her a "whore," "prostitute," "working girl," "hooker," or the like.  Plaintiff is none of these descriptions, and has never worked as a prostitute.

79.  In taking plaintiff into custody, and the subsequent ejection of the plaintiff from the premises, all defendants also defamed plaintiff through pantomime indicating that the plaintiff was a criminal.

80      Through participating in, fostering, and continuing the confinement, seizure and detention of the plaintiff, Cosmopolitan and its employees communicated to all concerned and present, including third persons in the Cosmopolitan security office, that plaintiff was a criminal.

81.     That as a result of the words and conduct of defendants, plaintiff was damaged as set forth above.

82.     That "Segura" and Signorello communicated to others that night, as aforesaid, in deed and word that plaintiff was an unchaste woman, and that she had committed a crime, i.e., prostitution, and/or solicitation for prostitution, and both communications constitute defamation *per se*.

83.     That defendants "Segura" and Signorello, employees of Las Vegas Metropolitan Police Department, exhibited oppression, malice, and fraud in the publications of plaintiff's

status as a criminal and a whore to third persons constituting defamation of plaintiff for which plaintiff should be awarded punitive damages. Cosmopolitan adopted and validated these statements directed at plaintiff, and in continuing the seizure of the plaintiff communicated to all present (inclusive of Ayda and the third party persons also being held) that plaintiff was a prostitute and criminal.

84.     That defendant Cosmopolitan also defamed plaintiff when it, through its representatives present in the area of detention that night, "86'd" or "trespassed" plaintiff from the premises indicating to others that Cosmopolitan adopted the characterization of the plaintiff as unchaste and a criminal despite the fact that Cosmopolitan's personnel knew of no facts that would allow for such a conclusion, and even verified their adoption and communication in the 86ing process while having direct evidence (lack of an arrest) that was contrary to the communication and there was no basis upon which to tag plaintiff as a prostitute or criminal.

85.     As a result of the defamation of plaintiff, plaintiff has been damaged as set forth above in actual and punitive damages.

## FIFTH CAUSE OF ACTION-INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

86.     Plaintiff incorporates ¶¶ 1-85 above as though fully restated herein.

87.     The actions of the defendants as stated above were contrary to all norms of civilized society.

88.     The actions of the defendants were undertaken intentionally.

89.     The actions of some of the defendants participated in by other of the defendants were intentionally calculated to inflict emotional distress on the plaintiff. For example, gratuitously referring to plaintiff as a whore and prostitute in front of third persons, and informing

plaintiff, while held against her will and without basis, that she will be going to jail when it was known to all concerned that she was not going to jail, that there was no basis for such statements, and that such statements would instill intense fear, apprehension, and emotional distress in plaintiff.  Additionally, the unjustified promises of prosecutions for being a harlot and a criminal were calculated to instill such fear within plaintiff, and all such directions calculated to instill fear, outrage, and severe emotional distress in plaintiff were successful. Further in this respect, all these statements made to elicit emotional distress from plaintiff were exacerbated by her helplessness in being imprisoned with no means of escape, no ability to contact the outside world for assistance, and the defendants' ability to control and direct plaintiff's liberty at the most basic levels.

90.     The threats, promises, and actions of the defendants calculated to inflict emotional distress upon the plaintiff took on an added level of urgency and impact in being imparted by law enforcement personnel with the authority of the state behind their threats causing the accompanying fear of the force of the entirety of society standing behind the threats, unwarranted promises of persecution, and oppressive actions.

91.     The actions of the defendants constitute actionable intentional infliction of emotional distress, and were undertaken with oppression, fraud, and malice by the defendants.

92.     As a result of the intentional infliction of emotional distress inflicted by the defendants, plaintiff has been injured as set forth above in actual and punitive damages.

WHEREFORE, Plaintiff prays for Judgment against Defendants, and each of them, jointly and severally, as follows:

1)     For general damages in excess of $10,000 on every claim for relief herein;

2)     For punitive damages in excess of $10,000 on those claims alleging the same;

3)     For costs of suit;

4)     For a reasonable attorney's fee;

5)   For interest at the legal rate on any judgment, from the date that the original complaint was filed; and

6)   For such other and further relief as the Court may find meet and proper in the premises.

DATED this _18th_ day of January, 2012.

GRAVES & LEAVITT


JOHN J. GRAVES, JR., ESQ.
601 SOUTH SIXTH STREET
LAS VEGAS, NEVADA  89101


NERSESIAN & SANKIEWICZ


/s/ Robert A. Nersesian
ROBERT A. NERSESIAN
528 SOUTH EIGHTH STREET
LAS VEGAS, NEVADA 89101


ATTORNEYS FOR PLAINTIFF
PLAINTIFF GOODMAN

22