1  LYSSA S. ANDERSON
   Nevada Bar No. 5781
2  KAEMPFER CROWELL RENSHAW
   GRONAUER & FIORENTINO
3  8345 West Sunset Road, Suite 250
   Las Vegas, Nevada  89113
4  Telephone:   (702) 792-7000
   Fax:            (702) 796-7181
5  landerson@kcnvlaw.com

6  Attorneys for Defendants
   LAS VEGAS METROPOLITAN POLICE DEPARTMENT;
7  JOHN SEGURA; and JAMES SIGNORELLO

8                      UNITED STATES DISTRICT COURT

9                         DISTRICT OF NEVADA

10  CHENTILE GOODMAN,                          Case No. 2:11-cv-01447-MMD-CWH

11            Plaintiff,
    vs.
                                               **LAS VEGAS METROPOLITAN POLICE**
12                                             **DEPARTMENT'S MOTION FOR**
    LAS VEGAS METROPOLITAN POLICE              **SUMMARY JUDGMENT**
13  DEPARTMENT, a political subdivision of the
    State of Nevada; COSMOPOLITAN
14  INTERNATIONAL COMPANY, INC., a
    Nevada corporation; NEVADA PROPERTY 1,
15  LLC, a foreign limited liability company;
    JOHN SEGURA; JAMES SIGNORELLO; and
16  DOES 1-30; and ROES 1-30, jointly and
    severally,
17
              Defendants.
18

19
            Pursuant to Fed. R. Civ. P. 56, Defendant LAS VEGAS METROPOLITAN POLICE
20
    DEPARTMENT ("LVMPD") hereby moves this Court for an Order Granting Summary
21
    Judgment to LVMPD on all of Plaintiff, Chentile Goodman's ("Goodman") claims for relief.
22
    / / /
23
    / / /
24

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada  89113

1    LVMPD's motion is based on the pleadings and papers on file herein, the following

2    memorandum of points and authorities, and the argument of counsel as made be heard by this

3    Court pursuant to LR 78-2.

4        DATED this 10th day of January, 2013.

5                                KAEMPFER CROWELL RENSHAW
                                 GRONAUER & FIORENTINO
6

7        BY:    /s/ Lyssa S. Anderson
                LYSSA S. ANDERSON (Nevada Bar No. 5781)
8                8345 West Sunset Road, Suite 250
                Las Vegas, Nevada 89113
9                **Attorneys for Defendants LAS VEGAS
                METROPOLITAN POLICE DEPARTMENT;
10               JOHN SEGURA; and JAMES SIGNORELLO**

11

12                   **MEMORANDUM OF POINTS & AUTHORITIES**

                          **I.        INTRODUCTION**
13

14       Goodman was approached and detained by LVMPD Vice Detectives (the "Detention")

15   for a myriad of reasons.  Among other things, Goodman was observed near the elevators of the

16   Cosmopolitan (a known area for loitering for prostitution) while provocatively dressed at 2:00

17   a.m. on a Thursday morning.  In addition, Goodman was known to be a dancer at the Spearmint

18   Rhino, an occupation that lends itself to prostitution.  If that were not enough, the Spearmint

19   Rhino was a known place for prostitution and, Goodman's companion that morning, Ayda

20   Mosafer ("Mosafer"), had been arrested at the Spearmint Rhino four (4) nights previously for

21   soliciting one of the Defendants.  Goodman's identity as a dancer at the Spearmint Rhino and

22   Mosafer's arrest were well known to the Defendant Officers as they were personally present at

23   the time of Mosafer's arrest.  Further, Mosafer was the wife of a well-known pimp, "Wheelchair

24   Mike."  Wheelchair Mike was known to Vice Detectives as running operations out of both the

Spearmint Rhino and the Cosmopolitan.  Finally, the Cosmopolitan itself was a place reported to

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

1   Vice Detectives as being "overrun with prostitutes".  Such allegations proved true as on the

2   evening of Goodman's detention, fourteen (14) women were arrested for prostitution related

3   offenses.

4       Despite these facts, Goodman has filed suit against the Las Vegas Metropolitan Police

5   Department ("LVMPD") and its Vice Officers alleging that her constitutional rights were

6   violated      by      the      Detention.      Goodman      goes      on      to      allege      that      the

7   Detention, even if proper, exceeded the time permitted by Nevada Law and that during the

8   detention she was subjected to battery, unlawful searches and seizures, and was defamed.

9   Goodman alleges that these acts were done intentionally with reckless disregard for causing her

10  emotional distress.

11      As set forth herein, Vice Detectives had reasonable suspicion to stop Goodman.

12  Moreover, Goodman has no admissible evidence to prove that she was detained in excess of one

13  hour.  Further, any search or seizure of Goodman's cell phone or purse was done for officer

14  safety as Goodman could have had a dangerous weapon.  Even if Goodman could demonstrate a

15  violation of her constitutional rights, Goodman has utterly failed to prove, through admissible

16  evidence, that such a violation was occasioned by a policy or practice of LVMPD as required

17  under *Monell*.

18      With respect to Goodman's state law claims, LVMPD is immune pursuant to NRS

19  41.032.  Even if this Court were to find that LVMPD did not enjoy statutory immunity,

20  Goodman has failed to establish sufficient facts to warrant submission of the state law claims to a

21  jury.  Accordingly, LVMPD is entitled to summary judgment on all claims.

22  / / /

23  / / /

24  / / /

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

1208060_1.doc  6943.40

## II.     STATEMENT OF UNDISPUTED FACTS

**A.     Third-Persons/Parties To The Incident.**

   **1.     Chentile Goodman ("Plaintiff").**

   At all times relevant herein, Goodman was a topless dancer at Spearmint Rhino ("Rhino").  (**Exhibit A**, pages 18-19.  Prior to working at the Rhino, Goodman worked as an outcall nude entertainer (escort) in San Diego, California, and a nude dancer at Christie's Cabaret in Arizona.  (**Exhibit A**, pages 14-19.  In June 2008, while working as an escort in San Diego, Goodman was cited and initially charged with soliciting an act of prostitution.  (**Exhibit A**, pages 26-29; **Exhibit B**, Superior Court of California Criminal Complaint).

   Goodman and Mosafer met while working at the Rhino and became friends.  (**Exhibit A**, pages 29-30).  Four (4) days prior to the Detention, as more fully set forth herein, during a vice-related operation at Rhino, Goodman was working and was aware Mosafer was arrested.  (**Exhibit A**, pages 40-42).

   **2.  Ayda Mosafer/Wheelchair Mike.**

   Mosafer was also an exotic dancer at Rhino**.**  (**Exhibit C**, pages 10-11).  Although Mosafer was also detained, she is not a party to this litigation.  Mosafer is married to Micah Duncan, a/k/a "Wheelchair Mike".  (**Exhibit C**, page 16).  Sometime prior to the Detention, Wheelchair Mike was the subject of an investigation by LVMPD's Pimp Investigation Unit.  (**Exhibit D**, page 33, lines 13-15).   LVMPD Vice Detectives were advised by the Pimp Investigation Unit that Mosafer was linked to Wheelchair Mike.  (**Exhibit D**, page 78, lines 16-17).  On February 5, 2011, Mosafer, was arrested for soliciting prostitution at the Rhino.  (**Exhibit D,** page 19 and **Exhibit C** at pg. 72).

/ / /

/ / /

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada  89113

### 3.    Sergeant James Signorello.

At the time of the Detention, Defendant James Signorello ("Signorello") was a Sergeant in the LVMPD Vice Section.  Signorello joined LVMPD in 1998.  (**Exhibit D**, page 9).  Prior to leaving Vice, Signorello worked Vice for approximately four and one-half (4 ½ ) years.  (**Exhibit D**, page 35, lines 18-22).  During that time Signorello made over seven-hundred (700) arrests for soliciting, prostitution, loitering, and/or trespassing, in vice-related operations at Casinos.  (**Exhibit D**, page 28).  Signorello was in charge of the vice-related operation at the Cosmopolitan the night of the Detention.  (**Exhibit B**, page 34).

Signorello was also the undercover Vice Officer who was solicited for sex by Mosafer on February 5, 2011 at the Rhino.  (**Exhibit D**, page 72, line 6).  On the night of the incident, Signorello recognized Mosafer from the arrest for prostitution four (4) nights earlier.  (**Exhibit D**, page 92, lines 18-19).

### 4.    Detective John Segura.

Defendant John Segura ("Segura") is a Detective with the LVMPD Vice Section.  Segura joined LVMPD in 1993.  (**Exhibit E**, page 7, line 7).  Segura was one (1) of several Detectives working the vice-related operation at the Cosmopolitan and was the Vice Detective that initially approached Plaintiff and Mosafer.  (**Exhibit E**, page 11, line 5 and page 26, lines 4-11).

**B.    The Incident.**

On February 9, 2011, Goodman picked up Mosafer from the airport.  See Amended Complaint at ¶ 6.  Goodman alleges that she and Mosafer's plans for the evening were to meet Goodman's boyfriend at the Henry in the Cosmopolitan for dinner and drinks.  See Complaint at ¶ 7.

/ / /

/ / /

Segura saw Goodman and Mosafer walking by the elevators.  He recalled that Mosafer had been arrested a few days earlier for prostitution at the Rhino.  (**Exhibit E**, pages 17-21)**.**[1] Mosafer testified that she recognized one of the LVMPD Vice Officers from the night she was arrested at the Rhino.  (**Exhibit C**, pages 29-30).  Segura attempted to engage Goodman and Mosafer in conversation in his undercover capacity.  (**Exhibit E**, page 26, line 11).  It appeared to Segura at that point that Mosafer recognized him.  (**Exhibit E**, page 27, line 2).  Goodman did not show interest in engaging in conversation with Segura.  (**Exhibit E**, page 27, lines 4-7). Instead, Goodman started sending a text message allegedly to her boyfriend.  (**Exhibit A**, page 65, lines 9-11).  At this time, Signorello and another Vice Detective (Gentry) joined Segura and the Vice Officers identified themselves to Goodman and Mosafer, asked them for their phones, and told them they needed to speak with them in the security office.  (**Exhibit E**, page 28; page 31.[2]  Goodman resisted giving Segura her telephone so he attempted to take it.  (**Exhibit E**, page 31).  The phone fell to the ground and was taken by Segura.  (**Exhibit** E, page 31, lines 14-16). Goodman and Mosafer were then escorted to the security office at the Cosmopolitan.  (**Exhibit A**, page 72, line 20).[3]  Once inside the security office, Segura asked Goodman and Mosafer for their purses and ID's.

At that time, Segura was given permission to obtain their ID's from their purses, and the purses were left on the table in the entrance of the security office.  (**Exhibit E**, pages 48-49;

---

[1]  According to Segura, the Cosmopolitan is an area known for high incidents of prostitution and specifically the elevators.  See **Exhibit E** at pgs. 24-25.

[2]  Based upon training and experience, in the prostitution subculture, cellular telephones pose huge safety risks to the Officers.  They can have concealed weapons in them, offenders will often utilize them to inform other offenders on the property that Vice is conducting an operation and inform their pimps.  See **Exhibit E** at pg. 31 and **Exhibit D** at pg. 135.  Additionally, the Vice Unit was advised that Wheelchair Mike and his lieutenants frequented the Cosmopolitan and may have been on the property on the night of the incident, posing another danger to the Vice Officers.  See **Exhibit E** at pg. 31.

[3]  During the escort to the security room at the Cosmopolitan and throughout the duration while Goodman and Mosafer were in the security room, they were not handcuffed, nor touched by any Officer, other than the instance of grabbing Plaintiff's arm to obtain possession of her cellular telephone.  See **Exhibit A** at pg. 120, **Exhibit B** at pgs. 33-34, and **Exhibit E** at pg. 48.

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

1208060_1.doc  6943.40

**Exhibit A**, page 76; and **Exhibit C**, pages 72-74).[4]   Based upon a security report generated by the Cosmopolitan, on that evening seventeen (17) females were detained in the security room for prostitution related issues.  (**Exhibit F**).  Goodman and Mosafer were investigated, released and then issued a trespass by the Cosmopolitan.  (**Exhibit A**, page 106, lines 9-14).   None of the parties can state with certainty how long Goodman and Mosafer were detained in the security office at the Cosmopolitan.  (**Exhibit A**, page 113, lines 11-15 and 147; **Exhibit D**, page 97, line 15; and **Exhibit E**, page 53, lines 10-15).

LVMPD Vice Detectives determined they did not have probable cause to arrest Goodman and Mosafer and they were released.  (**Exhibit E**, page 83, line 2).  A Cosmopolitan Security Guard escorted Goodman and Mosafer out of the casino.  (**Exhibit C**, page 67, lines 18-22; **Exhibit A**, page 120, lines 23-25).

**C.     LVMPD Policies and Procedures.**

**1.     LVMPD Critical Procedure 6/006.01 – Arrests Without Warrants**

The pertinent portion of LVMPD's Arrests Without Warrants Policy states in part:

> Stop and Frisk Prior to Arrest
> An officer does not need probable cause for arrest to stop a person, but reasonable suspicion is required.  Officers must have articulable factors for the stop and must be prepared to state in the report why the person was detained.
>
> Release of Arrested Persons
> An officer may immediately release from custody without any further proceedings any person he arrested without a warrant if the officer is satisfied that there are insufficient grounds for issuing a criminal complaint against the person.  A person so released shall be deemed not to have been arrested but only detained.  (Detention shall be no longer than 60 minutes nor extend beyond the place or immediate vicinity where the detention first effected – NRS 171.123).

---

[4]  Goodman alleges that her purse was searched.  See Complaint at ¶ 44.  It should be noted that neither Goodman nor Mosafer ever personally witnessed Segura, Signorello, nor any other LVMPD Vice Detective search their purses.  See **Exhibit B** at pg. 84 and **Exhibit A** at pg. 90.  Segura and Signorello both deny having searched Goodman and Mosafer's purses.  See **Exhibit D** at pg. 83 and **Exhibit E** at pg. 54.

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada  89113

### 2.      LVMPD Critical Procedure 6/002.00 – Use of Force

LVMPD's Use of Force Policy states in relevant portion:

> Reasonable Force
> The degree of force that is appropriate for gaining compliance. In accordance with Graham v. Connor, 490 U.S. 386 (1989), the degree of force used in effecting an arrest, investigatory stop or other seizure is evaluated by using a reasonable police member standard:  Whether the member's actions were "objectively reasonable" in light of the surrounding facts and circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the members or others, and whether the suspect is actively resisting arrest or attempting to evade arrest.

### D.      LVMPD's Hiring, Supervision and Discipline Of Its Officers.

LVMPD goes to great lengths to ensure the quality of its officers.  LVMPD places all applicants through a rigorous application program.  The program includes background checks, psychological evaluation, written and oral tests, polygraphs and other examinations.  According to LVMPD's official policy regarding training:

> The Department has the responsibility to provide the best personnel for service to the communities it serves.  In fulfilling that responsibility, it is the policy of the department to provide basic training to the new employee and advance, or in service training, for the experienced employee.

Moreover, during discovery, Plaintiff deposed the subject officers regarding their training.  These officers discussed the training received by them regarding search, seizure, and detention.  **Exhibit D**, pages 14-19; **Exhibit E**, pages 8-10 and pg. 15.  It is unrebutted that all LVMPD recruits undergo 21 weeks of intensive academy training and an additional 19 weeks of infield training before becoming an LVMPD officer.  During this 40 weeks of training, LVMPD officers receive intense and thorough training.  If a recruit fails or does not complete the training, he or she is not added to the force.  Further, after an office has graduated from the academy, he or she is required to continue training and education in these areas on a regular basis.  LVMPD's

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada  89113

1   training is nationally accredited and represents nearly twice the number of hours required by the

2   State of Nevada under N.A.C. § 289.140.

3       Moreover, LVMPD has adopted and implemented a comprehensive Department Manual

4   which is consistently updated.[5] The Manual contains, among other things, LVMPD's

5   expectations of officers, its standards of conduct, and the penalties associated with violations of

6   the standards.   LVMPD also maintains an Internal Affairs Bureau and has multiple levels of self

7   policing.

8               III.    STANDARD FOR SUMMARY JUDGMENT

9       Fed. R. Civ. P. 56 requires entry of summary judgment when "the pleadings, depositions,

10  answers to interrogatories and admissions on file, together with the affidavits, if any, show that

11  there is no genuine issue as to any material fact and that the moving party is entitled to a

12  judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct.

13  205, 91 L. Ed. 2d 202 (1986); *Newton v. Uniwest Financial Corp.,* 802 F. Supp. 346, 352 (D.

14  Nev. 1990).

15      A material issue of fact is one that affects the outcome of the litigation and requires a trial

16  to resolve the differing versions of the truth. See *Admiralty Fund v. Hugh Johnson & Co.,* 677

17  F.2d 1301, 1305-1306 (9th Cir. 1982). The movant must show the absence of a genuine issue of

18  material fact. *Garcia vs. Burns*, 787 F. Supp. 948, 949 (D. Nev. 1992).

19      An issue is not genuine if the evidence presented is self-serving and uncorroborated.  As

20  Justice Scalia wrote in *Scott vs. Harris*, U.S., 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007):

21          When opposing parties tell two different stories, one of which is
            blatantly contradicted by the record, so that no reasonable jury
22          could believe it, a court should not adopt that version of the facts
            for purposes of ruling on a motion for summary judgment.
23

24

---

[5]  As LVMPD's manual is extensive and to conserve resources, it is not attached as an exhibit.  Should the Court
wish to receive a copy, LVMPD will provide one.

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

The burden then shifts to the respondent to present evidence that support a verdict in its favor on every element of its claim. *Newton*, 882 F. Supp at 352. If the respondent's claim appears implausible within the factual context, the respondent must then more persuasive evidence than would otherwise be necessary to defeat the summary judgment motion. Garcia, 787 F. Supp. 948, 949. Finally, the summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## IV.   LEGAL ARGUMENT

### A.   LVMPD is Entitled to Summary Judgment on Goodman's Third Cause of Action For Violations of 42 U.S.C. §1983.

Liability for violations of 42 U.S.C. §1983 was extended to municipalities such as LVMPD as a result of *Monell v. Department of Social Service*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). According to *Monell*, such a claim requires the deprivation come directly from a plan or policy of the municipality and will only yield liability when the "execution of the government's policy or custom . . . inflicts the injury." Id. at 690-694. As such, Goodman's *Monell* claim must satisfy a total of four conditions:  (1) Goodman possessed a federal right which an officer, acting under color of state law, violated; (2) that LVMPD had a policy; (3) that the policy amounts to deliberate indifference to Goodman's constitutional rights; and (4) that the policy was the moving force behind the violation.  See *Van Ort. v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996), cert. denied, (519 U.S. 111.)

Simply put, in order to establish *Monell* liability, Goodman must demonstrate that execution of the government's policy or custom has inflicted the injury.  *City of Canton v. Harris*, 489 U.S. 378, 398, 109 S. Ct. 1197,103 L. Ed. 2d 412 (1989). Then, to satisfy the rigorous *Monell* requirements of causation and culpability, Goodman must "identify the policy,

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

connect the policy to the municipality and show that the injury was incurred because of the execution of the policy."  *Garner v. Memphis Police Dept.,* 8 F.3d 358, 364 (6th Cir. 1993).

In stark contrast, LVMPD cannot be held liable under §1983 merely because it employed a tortfeasor.  See <u>*Monell*</u>, 463 U.S. at 694 n. 58.  As a consequence, to prevent "municipal liability collaps[ing] into respondeat superior liability," federal courts must apply "rigorous standards of culpability and causation" in order to "ensure that the municipality is not held liable solely for the actions of its employees."  *Board of County Comm. of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed 2d 626 (1997).

It is clearly established law that a single constitutional deprivation (when undertaken by a state actor without final policy making authority) is insufficient to establish a long standing practice or custom for purposes of *Monell* liability.  See *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) ("a single constitutional deprivation is ordinarily insufficient to establish a long standing practice or custom"); *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000) (a plaintiff cannot demonstrate the existence of a municipal policy or custom based solely on a single occurrence of unconstitutional action by a non-policy making employee).  The plaintiff must therefore show the alleged misconduct has "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of the department."  *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984).

In sum, Goodman must demonstrate numerous examples of police misconduct with respect to her custom and policy allegations.  The requirement is one of "significant evidence" to show that a policy existed specifically authorizing or condoning the alleged practice.  See *Davis v. City of Ellensburg*, 869 F.2d 1230, 1234 (9th Cir. 1989).

/ / /

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada  89113

## 1.    Goodman's Constitutional Rights Were Not Violated.

Perhaps the most sweeping exception to the Fourth Amendment's warrant requirement, as well as its probable cause requirement, was created by the Supreme Court in *Terry v. Ohio*. [6] The *Terry* court held that under the Fourth Amendment it is reasonable for a law enforcement officer, without a warrant, to temporarily detain and question a person when the officer has "reasonable suspicion" that the person is about to engage in or is engaging in criminal activity.

It is difficult to articulate precisely what reasonable suspicion means.  The Supreme Court has stated that reasonable suspicion is "a particularized and objective basis for suspecting [a] person… of criminal activity."  *See Ornelas v. United States*, 517 U.S. 690, 696 (1996).  For reasonable suspicion to exist, the "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts" justify a brief detention.  *Terry*, 392 U.S. at 21.  Reasonable suspicion does not require a preponderance of the evidence.  *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

This standard, which is less than probable cause, is an objective one, i.e., would the facts available to the officer at the moment "warrant a man of reasonable caution in the belief that the action taken was appropriate?"  *Id.* at 21-22.  Mere subjective "hunches" of an officer, even is possessed in good faith, are insufficient.  *Id.* at 22.  However, courts determining whether reasonable suspicion existed must afford some decree of deference to law enforcement officers in their inferences from the facts known to them.  *See United States v. Arvizu*, 534 U.S. 266, 273-274 (2002).  Further, reasonable suspicion can be based on the "collective knowledge" of multiple police officers, at least when there is actual communication between officers.  *See, e.g., United States v. Pardue*, 385 F.3d 101, 106-107 (1st Cir. 2004).   Because its standard is relatively low, "*Terry* accepts the risk that officers may stop innocent people."  *Illinois v.*

---

[6] 392 U.S. 1 (1968).

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

1    *Wardlow*, 528 U.S. 119, 126 (2000).

2         In addition to allowing for such brief "stops" of suspicious persons, *Terry* also permits

3    frisks of the detained person's outer clothing where there is reasonable suspicion the person is

4    armed and dangerous. *Terry*, 392 U.S. at 24-29.

5              **a.      LVMPD Officers Had Reasonable Suspicion To Stop Goodman.**

6         LVMPD Vice Detectives were at the Cosmopolitan because, according to the

7    Cosmopolitan, "the place was overrun with prostitutes." (**Exhibit D**, page 39, lines 16-24).  As

8    set forth in the statement of facts, the Cosmopolitan was correct as, on that evening alone, more

9    than fourteen (14) arrests were made for prostitution related offenses.  (**Exhibit D**, page 26, lines

10   7-21.)  Vice Detectives recognized Goodman and Mosafer as dancers at the Spearmint Rhino.

11   (**Exhibit E**, page 12, line 4).  The Vice Detectives, based on their practical experience with

12   prostitution have determined that there is a link between exotic dancing and prostitution.

13   (**Exhibit D**, page 25, lines 13-19).  More specifically, however, LVMPD Vice Detectives knew

14   that prostitution was taking place out of the Spearmint Rhino as they had engaged in a vice

15   operation there only four nights before.  (**Exhibit D**, page 32, lines 12-19).

16         Vice Detectives observed Goodman and Mosafer walking by the hotel elevators, dressed

17   provocatively on a Thursday morning at 2:00 a.m. Vice Detectives recognized Mosafer as having

18   been arrested for prostitution during that recent vice operation.  In fact, the very Vice Detective

19   who was solicited by Mosafer was involved in the Detention.  Thus, Vice Detectives had first-

20   hand knowledge that Mosafer was engaging in prostitution.  (**Exhibit D**, page 32, lines 15-16).

21   As if all of this wasn't enough, Vice Detectives were aware of the fact that there was an ongoing

22   investigation related to the activities of a well-known pimp, "Wheelchair Mike." During the

23   investigation, it was believed that Wheelchair Mike was undertaking his operations at both the

24   Spearmint Rhino and the Cosmopolitan.  (**Exhibit E**, page 31, lines 1-8).  Interestingly enough,

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

Mosafer is married to Wheelchair Mike.  Vice Detectives are aware that the wives of pimps often recruit and groom prostitutes.  (**Exhibit E**, page 79, lines 8-15).

It is difficult to envision a scenario where Vice Detectives would have more reasonable suspicion to stop Goodman and Mosafer.  As set forth above, Goodman's location, her association with Mosafer, her dress, and her occupation all factored into the reasonable suspicion to detain her.

> ### b.    Under *Terry* and Nevada Law, The Officers Had The Right To Take Plaintiff's Cell Phone.

As set forth above, *Terry* permits frisks of the detained person's outer clothing where there is reasonable suspicion that the person is armed and dangerous.  *Terry*, 392 U.S. at 24-29.  Further, NRS 171.1232, allows a police officer to search for and seize from a person detain under *Terry*, a dangerous weapon.  As Goodman and her companion, Mosafer, were approached by Vice Detectives, Goodman started to send a text message to her boyfriend.  (**Exhibit A**, page 65, lines 9-11).   As explained by Vice Detectives, in the prostitution subculture, cellular telephones are considered contraband in that they can be used as weapon, either literally as a disguised weapon, or as a contact to other prostitutes or pimps.  (**Exhibit D**, page 135, lines 8-18; **Exhibit E**, page 31, lines 1-8).  As Goodman could have been contacting a violent pimp, warning other prostitutes, or have had a weapon disguised as a cell phone, for officer safety, Vice Detectives asked Goodman for her phone.  When Goodman refused her phone was taken from her.  (**Exhibit E**, page 31, lines 14-16).  Thus, seizure of the cell phone was legally proper under *Terry* and Nevada Law.

> ### c.    The Seizure Of Plaintiff's Purse was Proper.

At ¶ 44 of Plaintiff's Amended Complaint, Goodman alleges that her purse was taken by Segura, Signorello, and the personnel of the Cosmopolitan to a place outside of her access.  She further alleges that the purse was searched.  Other than these bald allegations, Goodman has no

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

proof, other than her admitted assumption, that her purse was searched.  According to Goodman, upon entry into the security office her purse was taken.  (**Exhibit A,** page 76, lines 10-13). However, she was unable to identify who took it.  (**Exhibit A**, page 78, lines 15-21).  She admits that she did not see if anyone ever went through the purse.  Instead, she merely assumed that they did.  (**Exhibit A**, page 90, lines 1-3).  Goodman's assumption that her purse was searched is not sufficient to create an issue of fact.  Both Segura and Signorello have testified that they did not search her purse and that they did not see anyone search her purse.  Goodman has failed meet her burden, thus Goodman's allegations relating to an improper search must fail.

With respect to seizure, in Goodman's Amended Complaint, Goodman correctly identifies that a seizure of her purse would be occasioned by NRS 171.1232.  As set forth above, that statute allows a police officer to search for and seize from a person detained under *Terry*, a dangerous weapon.  Set forth in the statement of facts, the business of prostitution is not pretty. Among other things, the police officers have learned that suspects can carry weapons disguised as cell phones and other weapons.  As Goodman was detained in the security office for investigation, it would compromise officer safety to allow her to have her handbag which could contain a weapon.  In the lieu of making a warrantless search of her handbag, it was simply taken and placed in a row on the floor.  (**Exhibit A**, page 117, lines 6-9).  Such act does not violate Goodman's constitutional rights.

### 2.     LVMPD Does Not Have a Policy To Violate Constitutional Rights.

In Goodman's Amended Complaint, Goodman does not articulate a *Monell* claim against LVMPD.  Indeed, in the legal allegations forming her cause of action, Goodman neither alleges an unconstitutional policy nor a long standing practice or custom which constitutes the standard operating procedure of the government entity.  (Amended Complaint, ¶¶'s 70-76).  Indeed, Goodman's sole allegation relating to a policy or practice of LVMPD is found in ¶ 41 of the

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada  89113

Amended Complaint.  There, Goodman alleges "from the number of such detentions that have resulted in women being detained but not charged, or detained for an excess of one hour in the confines and custody of casino security without being arrested (in violation of NRS 171.123), the Las Vegas Metropolitan Police Department necessarily recognizes that the extra-constitutional and extra-statutory detentions of persons meeting the above referenced character is occurring, and rather than correct the problem, have gone so far as to solicit and encourage the casino industry inclusive of Cosmopolitan to continue and assist in such illegal policies.  Thus, Goodman's *Monell* claim as plead, is limited to the allegation that there is a practice of detaining women without reasonable suspicion and detaining women in excess of sixty (60) minutes that permitted by statute.

However, aside from her own sole allegation of wrongful arrest, she has produced no evidence that the individual officers violated her constitutional rights . . . ***let alone produced even one single other example of a similar violation of a citizen's rights.***  Goodman has no evidence to suggest that others have been detained without reasonable suspicion or that others have been detained in excess of one (1) hour without probable cause.  Further, Goodman has no evidence to corroborate her conclusion that any detention which resulted in a release was made without reasonable suspicion.  Such conclusion is not supported by any admissible facts.

When a plaintiff alleges a de facto policy, like the instant case, there must be substantial evidence to indicate the practice is much different from the written policy.  The Ninth Circuit in *Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996), *cert. denied*, (520 U.S. 1117) (1997), stated:

> Absent a formal governmental policy, [the plaintiff] must show a "long standing practice or custom which constitutes the standard operating procedure of the local government entity."  The custom must be so "persistent and widespread", that it constitutes a "permanent and well settled city policy."  Liability for improper custom made not be predicated on isolated sporadic incidents, it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

1    of carrying out policy.

2    Id. at 918 (internal citations omitted).

3        Here, the record is barren of any evidence to suggest that LVMPD approves or ratifies of

4    violations of citizens' civil rights.  The policy of LVMPD is for its officers to conduct their duty

5    within ethical and constitutional standards and to discipline any officer who violates

6    departmental policy.  The IA investigation process and the Citizen's Review Board process

7    clearly evidence such a commitment.  Goodman has produced no evidence to the contrary.  At

8    best, Goodman has demonstrated one incident where her own rights may have been violated.

9    This fact is best punctuated by the Plaintiff's own words.  In the Plaintiff's Amended Complaint,

10   Plaintiff does not allege that her detention was as a result of a policy or practice of LVMPD.

11   Instead, Plaintiff alleges that her detention was Defendant Segura's punishment for somehow

12   hurting his feelings by rebuffing his advances.  (Amended Complaint at ¶ 14 and ¶ 66, wherein

13   Plaintiff alleges that the detention was "street justice for rebuffing [Segura]'s advances".

14   Plaintiff's allegations in this regard continued in her opposition to the Cosmopolitan's Motion to

15   Dismiss, Document 16, wherein Plaintiff alleged that her seizure and detention was the police

16   officer's ridiculous reaction to being rebuffed while surreptitiously attempting to portray "John

17   on the make."  Document 16, page 4, lines 23-26.  As such, this incident . . . even if it occurred

18   exactly as Goodman claims . . . is deficient as a *Monell* theory of recovery.  *See Christie*, 176

19   F.3d at 1235; *McDade*, 223 F.3d at 1141.

20   **B.    LVMPD is Immune from Goodman's State Law Claims of Battery and Intentional**
     **Inflication of Emotional Distress.**

21       The first issue for this Court is whether Nevada's governmental immunity statute protects

22   police officers from liability when the decision to detain an individual upon reasonable suspicion

23   requires the officer to use personal judgment and deliberation.

24

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada  89113

Nevada has generally waived its sovereign immunity.  *See Nev. Rev. Stat.* § 41.032(1). Its waiver, however, contains exceptions.  One exception is no action may be brought against any officer of an employee of Nevada "[b]ased upon the exercise or performance of the failure to exercise or perform discretionary function or duty on the part of the state or any of its agency or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused."  *Nev. Rev. Stat.* § 41.032(2).  In addition, *Nev. Rev. Stat.* § 41.0336 states that LVMPD is not responsible for the "negligent acts" of its officers unless the officer affirmatively causes the harm.  *Id.*

Nevada's discretionary function statute mirrors the Federal Torts Claims Act.  *Marintez v. Maruszczak*, 167 P.3d 720, 727 (Nev. 2007).  Nevada looks to Federal decisional law on the Federal Torts Claims Act for guidance on what type of conduct discretionary immunity protects. *Neal-Lomax v. Las Vegas Metro. Police Dep't.,* 574 F. Supp. 2d 1170, 1192 (D. Nev. 2008). The purpose of Nevada's discretionary immunity statute and the Federal Tort Claims Act is to compensate victims of negligence by government actors the same way they would be compensated if the actors were private.  *Martinez*, 168 P.3d at 727.

The Nevada Supreme Court has adopted the Federal test for discretionary-function immunity.  *Id.* at 728.  Under this test, the discretionary-function immunity applies when (1) the act alleged involves elements of judgment or choice; and (2) the act is of the kind that discretionary function immunity was intended to protect.  *Id.*  The second prong is satisfied when the act is susceptible to policy analysis, even if the actor did not consciously weigh policy considerations.  *Id.*   Under this test, discretionary-function immunity does not apply to "negligence unrelated to any plausible policy objectives."  *Id.* (*quoting Coulhurst v. United States*, 214 F. 3d 106, 111 (2nd Circuit 200).  For example, a government employee falling asleep at the wheel and causing an accident would not get discretionary-function immunity.  *Martinez*,

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

169 P.3d at 729.  In analyzing discretionary-function immunity, courts must keep in mind the purpose of the immunity; to prevent judicial second guessing of legislative and administrative decisions based on social, economic, and political policy.  *Id.*

The Nevada Supreme Court has specifically rejected a test for discretionary-function immunity based on governmental-proprietary, planning-operations, and discretionary ministerial distinctions.  *Id.* at 725-27.  Under a governmental-proprietary distinction, discretionary-function immunity protects actions essential to the core of government activity but no actions that private individuals or entities could perform.  *Id.* at 725.  Under the discretionary-ministerial distinction for law enforcement, discretionary-function immunity applies to any act that involves "personal deliberation, decision, or judgment" but not to acts that merely amount "obedience to orders or the performance of duty."  *Id.* at 727 (*quoting Ortega v. Reyna*, 953 P.2d 18, 23 (Nev. 1998)).

The decision of whether to detain an individual for investigation is clearly a discretionary function.  The officer making the detention must use his personal deliberation, decision, and judgment based upon the information presented to him.  Nevada courts have never specifically held that the decision to arrest and/or to detain is discretionary, however, in *Coty v. Washoe County*, the Nevada Supreme Court, in *dicta*, clearly stated that the "decision of whether to make an arrest is largely discretionary" and most likely protected by Nev. Rev. Stat. § 41.032(2).  *See Coty v. Washoe County,* 108 Nev. 757, 752 n.7 (1992).  This approach makes senses and is supported by almost every single state with a discretionary-immunity statute.  *See Kersey v. Wilson*, 69 S.W. 3d 794, 798 (Tex. App. Forth Worth 2002) (holding that officers decision to arrest is a discretionary-function satisfying the second element of the official immunity test); *Bauer v. City of Hartford*, slip copy, 2010 WL4429697 (D. Conn. 2010) (Connecticut courts holds that decision to arrest is discretionary protected by immunity); *Soto v. Bonner Springs*, 38 Kan. App. 2d 382, 166 P.3d 1056 (Kan. App. 2007) (officers who arrested a suspect on warrant

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

1208060_1.doc  6943.40

Page 19 of 25

1   intended for another person with the same name protected by discretionary-function immunity);

2   *McCoy v. Crook County Sheriff's Department*, 987 P.2d 674 (Wyo. 1999) (decision to arrest is a

3   discretionary-function).

4          The Nevada Supreme Court in *Coty* suggested that the decision to arrest is covered by

5   Nev. Rev. Stat. § 41.032.  As set out above, other courts have reached similar conclusions.

6   Along those same lines, in this case each of the Defendant officers used their personal

7   deliberation and judgment to conclude that reasonable suspicion existed to detain Goodman.

8   There is no evidence that any of the officers acted in bad faith or maliciously.  In fact, Goodman

9   was one of two people who were neither formally arrested nor transported to the Clark County

10  Detention Center out of the eighteen (18) detained.  Given the facts set out above relating to the

11  existence of reasonable suspicion, it is clear that these officers did their best under the

12  circumstances and acted appropriately in detaining and questioning Goodman.  This is the exact

13  type of action that governmental-immunity is intended to protect.  Otherwise, officers will be

14  faced with difficult choices of determining whether to stop and detain people may be suspected

15  of committing crimes in situations such as this.  For these reasons, Goodman's claims fail as a

16  matter of law.

17  **C.     LVMPD is Entitled to Summary Judgment on Goodman's First Cause of Action.**

18         Goodman's false arrest and false imprisonment claims are related to her § 1983 claims as

19  they all are based on her allegation that the officers lacked reasonable suspicion to detain her.

20         Based on the facts set out above, the LVMPD Vice Detectives had more than enough

21  information to allow a person of reasonable caution to believe that Goodman and Mosafer may

22  have been loitering for the purpose of prostitution.  Because her detention was supported by

23  reasonable suspicion, Goodman cannot make a facially, plausible claim for false arrest or false

24  imprisonment under Nevada law.  See *Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981)

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada  89113

1  ("to establish false imprisonment of which false arrest is a integral part, it is necessary to prove

2  that the person be restrained of his liberty under the probable imminence of force without any

3  legal cause or justification").  (Internal quotation marks and citations omitted).  Accordingly, she

4  cannot allege a facially plausible claim for false arrest or false imprisonment.

5       Along the same lines, Goodman alleges that even if Vice Detectives had reasonable

6  suspicion to stop her, the stop exceeded the sixty (60) minute time frame permitted by Nevada

7  Law.  Goodman's claim that the detention exceeded sixty (60) minutes is not supported by any

8  admissible facts.  Simply put, Goodman does not know how long she was detained.  Goodman

9  guesses and speculates that she was detained in excess of one (1) hour, however, Goodman has

10  no admissible proof to conclusively establish that she was.  As it is Goodman's obligation to

11  prove that her detention exceeded that permitted by statute, Goodman's fails her burden.

12  Accordingly, Goodman cannot sustain a cause of action for an alleged detention exceeding one

13  (1) hour.

14  **D.    LVMPD is Entitled to Summary Judgment on Goodman's Fifth Cause of Action for Intentional Infliction of Emotional Distress.**

15       Should this Court find that NRS 41.032 does not apply to Goodman's claim for

16  intentional infliction of emotional distress, in any event, Goodman has insufficient evidence to

17  support this claim.  Intentional infliction of emotional distress is a common law claim, the

18  elements of which follow the Restatement (2d) of Torts and are set out in *Star v. Rabello*, 97

19  Nev. 124, 625 P.2d 90 (1981).  A claim for intentional infliction of emotional distress requires:

20

21       (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) the plaintiff suffers severe or extreme emotional distress; (3) actual or proximate cause.

22

23  *Rabello*, 97 Nev. at 125, 627 P.2d at 93.

24

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

"It is not enough that a defendant has acted with an intent which is tortious or even criminal, or that he is intending to inflict emotional distress."  *Restatement* (2d) of Torts §46, cmt. d (1965).  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Id.  Liability does not extend to mere insults, indignities, threats or annoyances.  Id.

Where a plaintiff fails to produce any evidence to establish either the first or second element of a claim for intentional infliction of emotional distress, entry of summary judgment in favor of the defendant is appropriate.  *See Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 447, 956 P.2d 1382, 1386 (1998).  *See also Moreland v. Las Vegas Metro. Police Dept.*, 159 F.3d 365, 374 (1998) (holding that grant of summary judgment in favor of Defendant police officer was appropriate where Plaintiff did not identify sufficient evidence to create a trial issue as to whether the officer engaged in extreme or outrageous conduct, with at least reckless disregard to cause emotional distress).

Here, Goodman has no evidence that the decision to detain her was made with either the intention of, or reckless disregard for, causing emotional distress.  Instead, given the overwhelming number of factors leading to the Detention, it is clear that the Vice Detectives detained her in good faith.

As set forth herein, the undisputed facts conclusively demonstrate that there was reasonable suspicion to detain Goodman.  Even if this Court were to second guess the fact that Goodman was allegedly "provocatively dressed", and was in a high prostitution area at 2:00 a.m. on a Thursday, it is impossible overlook the fact that she was with a known prostitute, who had been arrested four (4) days prior for soliciting one of these Defendants, and who is the wife of a well-known pimp, who is known to operate out of the Cosmopolitan.  Given the existence of

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

1208060_1.doc  6943.40

Page 22 of 25

reasonable suspicion, the decision to detain cannot constitute extreme and outrageous conduct.

Similarly, the removal of Goodman's phone was not made with either the intention of, or reckless disregard for, causing emotional distress. Instead, as set forth above, it was done for the sole purpose of officer safety and pursuant to NRS 171.1232. As the removal of the phone was legally proper and because Goodman admittedly did not offer the phone to Defendants, Goodman's claim for the intentional infliction of emotional distress on these facts similarly fails.

Finally, Goodman takes much umbrage at the fact that she was detained with others who were suspected of engaging in solicitation at the Cosmopolitan. Again, the manner in which Goodman was detained was not designed to cause emotional distress to the Goodman. Moreover, it was not set up in that fashion with reckless disregard for causing emotional distress to someone such as Goodman. Instead, as set forth above, the Cosmopolitan was overrun with prostitutes. That night alone, fourteen (14) women were arrested and transported to Clark County Detention Center. Thus, it was out of necessity that Goodman was detained with the others who were being similarly detained.

Further, even if this Court were to find that detaining Goodman with the other women who was done with reckless disregard for causing emotional distress, Goodman's claim would still fail. As set forth above, Goodman herself has been previously arrested for soliciting an act of prostitution. Thus, the fact that she was forced to spend time with others who were subject to the same suspicions, could not result in severe or extreme emotional distress. Indeed, Goodman has proferred no evidence in this litigation to suggest that she has suffered severe or extreme or emotional distress.

**E.      Plaintiff's Fourth Cause of Action for Defamation Fails.**

LVMPD incorporates by reference the Argument found at Section IV(E) of Defendants' Segura and Signorello's Motion for Summary Judgment, as if fully set forth herein.

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada  89113

1

## V.     CONCLUSION

2          Based on the foregoing, LVMPD respectfully requests that this Court grant its Motion for

3   Summary Judgment on all claims.

4          DATED this 10th day of January, 2013.

5                                          KAEMPFER CROWELL RENSHAW
                                           GRONAUER & FIORENTINO
6

7                                   BY:     /s/ Lyssa S. Anderson
                                           LYSSA S. ANDERSON (Nevada Bar No. 5781)
8                                          8345 West Sunset Road, Suite 250
                                           Las Vegas, Nevada 89113
9                                          **Attorneys for Defendants LAS VEGAS
                                           METROPOLITAN POLICE DEPARTMENT;
10                                          JOHN SEGURA; and JAMES SIGNORELLO**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on this date I electronically filed the foregoing **LAS VEGAS**

3   **METROPOLITAN   POLICE   DEPARTMENT'S   MOTION   FOR   SUMMARY**

4   **JUDGMENT** using the court's CM/ECF system which will send notification to the following:

5   John J. Graves, Jr., Esq.
    Graves & Leavitt

6   601 South Sixth Street
    Las Vegas, Nevada 89101

7   (702) 385-7277
    (702) 385-1178 - facsimile

8   gravesleavitt@aol.com
    **Attorneys for Plaintiff**

9
    Robert A. Nersesian

10  Nersesian & Sankiewicz
    528 South Eighth Street

11  Las Vegas, Nevada 89101
    (702) 385-5454

12  (702) 385-7667 - facsimile
    vegaslegal@aol.com

13  **Attorneys for Plaintiff**

14      DATED this 10th day of January, 2013.

15

16  _____

17  an employee of Kaempfer Crowell

18

19

20

21

22

23

24

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113