1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CHENTILE GOODMAN,

Plaintiff,

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, et al.,

Defendants.

Case No. 2:11-cv-1447-MMD-CWH

ORDER

(Plf.'s Motion in Limine – dkt. no. 74;
Def.'s Motions for Summary Judgment –
dkt. nos. 81 and 82;
Def.'s Motion to Seal – dkt. no. 87;
Plf.'s Motion for Partial Summary
Judgment – dkt. no. 84)

This is a civil rights suit arising out of the detention of a woman by the Las Vegas
Metropolitan Police Department ("LVMPD") on suspicion of prostitution during a Vice
anti-prostitution sting operation.  Before the Court are the competing summary judgment
motions of both parties (dkt. nos. 81, 82, and 84), as well as Plaintiff's Motion in Limine
(dkt. no. 87) and Defendants' Amended Motion to Seal (dkt. no. 87). Oral argument was
heard on all but the Motion in Limine on July 25, 2013. (Dkt. no. 121.) In short, the Court
holds that Defendants violated Plaintiff's constitutional rights during her detention and
arrest, and grants in part Plaintiff's Motion for Partial Summary Judgment consistent with
the reasoning set forth below.

I.    BACKGROUND

A.    The Parties

Plaintiff Chentile Goodman, a resident of Las Vegas, Nevada, worked as a dancer
at the Spearmint Rhino, a gentleman's club in Las Vegas. The incident that gave rise to
this action occurred during an evening out with Goodman's friend and colleague, Ayda

1    Mosafer, another dancer at the Spearmint Rhino. Four days prior to the incident,

2    Mosafer was arrested for soliciting prostitution at the Rhino, but was ultimately released

3    without charge.

4         Defendant James Signorello was a Sergeant in the LVMPD Vice Section.

5    Defendant John Segura was a Detective in the same section. The Vice Section of

6    LVMPD "is responsible for investigating vice-related crimes, including arresting and

7    prosecuting prostitutes, their clients, and pandering suspects; prostitution-related

8    larcenies; drug-related trick rolls, businesses that front for prostitution; sexually-oriented

9    criminal enterprises; juvenile prostitution and related pornography; and felony HIV

10   prostitution cases." *LVMPD > Sections > Vice*, LAS VEGAS METROPOLITAN POLICE

11   DEPARTMENT, http://www.lvmpd.com/Sections/Vice/tabid/190/Default.aspx (last visited

12   July 22, 2013).

13        **B.    Vice Procedure**

14        This suit arises out of a Vice anti-prostitution sting operation conducted at the

15   Cosmopolitan Hotel and Casino ("the Cosmopolitan") in Las Vegas. According to

16   Signorello, Vice enforcement activity is often requested by the casinos themselves to

17   "clean up" their property.[1] (Dkt. no. 84-4 at 10.) These casinos cooperate with law

18   enforcement by providing access to secured facilities and rooms that enable Vice anti-

19   prostitution operations. (*Id.* at 11.) Vice detectives arrive as a squad to a property and

20   attempt "to make as many contacts and as many arrests as [they] can in such a small

21   window." (*Id.* at 6.) Signorello explained that this hurried procedure arises out of a need

22   to ensure that targets of their operation lack the time to communicate to their associates

23   the presence of a law enforcement operation. (*Id.*) For that reason, officers attempt to

24   keep as low a profile as possible and not reveal themselves to any of their potential

25   targets. (*Id.*)

26

27   _____

28        [1]Sergeant Signorello described the details of a typical Vice operation to
     investigators within LVMPD's Office of Internal Affairs.

2

When they arrive at a particular property, the squad splits up into teams, makes contact with potential targets undercover, and attempts to secure probable cause for solicitation charges during the course of their contact.[2] If successful, officers then identify themselves, detain the individual, and escort them to a secured facility on the premises. (*Id.* at 6.) Escorting a female may often involve taking a hold of her arms. (*Id.* at 9.) Signorello describes these operations as often being "chaotic" due to the high number of women detained by the officers and the short window of time in which these detentions must occur. (*Id.* at 6.)

A woman detained in a prostitution sweep may be handcuffed if officers determine that she is unruly or combative. (Dkt. no. 84-4 at 12.) According to Signorello, these detentions may last "for a while and sometimes for an hour." (*Id.*) Generally, no timekeeping is done to monitor the length of time any individual suspect is detained in these facilities. (*Id.* at 13.)

### C.   The Incident

Goodman and Mosafer planned on an evening of dinner and drinks at the Henry, a restaurant and bar at the Cosmopolitan on the evening of February 9, 2011. Having arranged to also meet her boyfriend that evening, Goodman walked with Mosafer through the casino floor on route to the Henry. The parties dispute when exactly the incident occurred; Goodman claims it occurred near midnight on February 9, while Defendants represent that it was closer to 2:00 a.m. on the morning of February 10. At the same time, LVMPD officers were engaged in a large anti-prostitution sting operation at the Cosmopolitan after receiving "complaints that the place was being overrun" with prostitution-related activity. (Dkt. no. 84-4 at 5.) At the time, Vice officers were particularly interested in pursuing an investigation of a suspected pimp known as "Wheelchair Mike," the husband of Mosafer.

---

[2]Nevada law charges engaging in or solicitation of prostitution as the same offense. *See* NRS § 201.354(1). A person who engaged in prostitution or solicits prostitution is guilty of a misdemeanor. NRS § 201.354(2).

The parties dispute much of the remaining facts from this point onward. The facts are recalled here as articulated in Goodman's deposition, unless indicated otherwise. According to Goodman, she and Mosafer were walking towards the Henry when she was first approached undercover by Segura and Signorello. Segura attempted to proposition her by asking if she knew of "something to do or a fun place to go." (Dkt. no. 84-1 at 63–64.) The women rebuffed their advances, and continued walking. After reaching the Henry and seeing that her boyfriend had not yet arrived, she began to send him a text message. At this point, and possibly after a few more attempts at solicitation, Goodman testified that Segura walked up to her, clutched her by the upper arm, grabbed her mobile phone that had fallen to the floor, and proceeded to escort her away to Cosmopolitan's security office.

According to Defendants, Segura and Signorello spotted the women as they were walking near the elevators of the Cosmopolitan. One of them recognized Mosafer from an operation four days earlier that resulted in her arrest. Segura approached the women and attempted to solicit them. After failing to do so, Segura recalled that Signorello and another detective approached both women, and the three detectives identified themselves as officers. Segura recalled that Goodman resisted his request for her telephone, and that she became combative and argumentative. (Dkt. no. 84-3 at 34–35; 84-5 at 4.) Signorello did the same to Mosafer, grabbing her arm, which also caused her to drop her phone to the ground, and escorting her as well.[3] Goodman alleges that she was stopped near the Henry when the initial detention occurred, while Defendants represent that the detention occurred while Goodman was walking near the Casino's elevators.

Goodman and Mosafer were then escorted to the casino's security office, and were detained there for an indefinite period of time. Although the precise location of the security office was difficult to glean from the deposition testimony, the room's entrance

---

[3]In his deposition, Signorello did not recall that he was the officer who approached Mosafer.

1   does not face the main casino floor where Goodman and Mosafer were initially
2   approached; rather, its entrance adjoins a hallway that opens up onto the casino floor.
3   Both women were escorted to this room from the location where they were initially
4   contacted. The security office itself consists of two separate rooms, with a number of
5   individuals, including a Cosmopolitan security officer, present when Goodman entered
6   the facility. The parties dispute the length of Goodman and Mosafer's detention.
7   Defendants do not provide a positive time estimate for its length (*see* dkt. no. 84-2 at 97;
8   84-3 at 53), while Goodman testified that it was up to two hours in duration.

9       Several other women were detained in the security room as a result of the sting
10  operation. (Dkt. no. 84-3 at 52.) According to Goodman, other detained women were
11  filing into the room over the course of the evening to the point where she had to relocate
12  her position due to overcrowding. At the end of the evening, a number of these women
13  were ultimately arrested for prostitution-related offenses. (*Id.* at 80.) At oral argument,
14  Defendants noted that a total of 17 women were detained, and 14 of them were
15  arrested.

16      According to her testimony, Goodman's purse was taken from her as soon as she
17  entered the security facility. (Dkt. no. 84-1 at 77–78.)  Early in her detention Goodman
18  was asked a number of questions, including what she was doing at the casino and
19  where she was employed. (*Id.* at 85.) On numerous occasions, Goodman inquired as to
20  the reason for her detention, and asked to be released to her boyfriend. Her requests
21  were denied.

22      During her detention, Goodman testified that her purse was searched. Though
23  she did not herself see the search, she recalls her identification stored in her purse being
24  presented to her as well as questions and comments from a detective about the money
25  in her wallet. (Dkt. no. 84-1 at 89–90.) According to Segura, he asked Goodman before
26  she arrived at the security room whether she carried identification, and she responded
27  that it was in her purse. She then consented to his retrieving the I.D. from her purse after
28  ///

5

1  he asked her for it. (Dkt. no. 84-3 at 48.) Segura testified that he did not recall whether

2  he searched Goodman's purse for money. (Dkt. no. 84-3 at 49.)

3          After being held for up to two hours, Goodman and Mosafer were both released

4  without being charged.

5          **D.     Procedural History**

6          On August 22, 2011, Goodman filed suit against LVMPD, the Cosmopolitan

7  International Company, Inc., and Nevada Property 1, LLC (owner of the Cosmopolitan)

8  in the Eighth Judicial District Court in Clark County, Nevada. LVMPD removed the case

9  to this Court on September 8, 2011. In her Amended Complaint, Goodman asserts

10 claims for (1) false imprisonment, (2) battery, (3) violation of the Fourth Amendment, (4)

11 defamation, and (5) intentional infliction of emotional distress. (*See* dkt. no. 50.)

12 Goodman filed a Motion in Limine seeking to exclude evidence of other crimes, wrongs,

13 or acts committed by her. (*See* dkt. no. 74.)  She also seeks partial summary judgment

14 on her Fourth Amendment and state law false imprisonment claims. Defendants have

15 also moved for summary judgment, seeking judgment on all of Goodman's claims.

16 **II.     LEGAL STANDARD**

17         **A.     Motion in Limine**

18         A motion in limine is a procedural device to obtain an early and preliminary ruling

19 on the admissibility of evidence. Black's Law Dictionary defines it as "[a] pretrial request

20 that certain inadmissible evidence not be referred to or offered at trial. Typically, a party

21 makes this motion when it believes that mere mention of the evidence during trial would

22 be highly prejudicial and could not be remedied by an instruction to disregard." Black's

23 Law Dictionary 1109 (9th ed. 2009). Although the Federal Rules of Evidence ("FRE") do

24 not explicitly authorize a motion in limine, the Supreme Court has held that trial judges

25 are authorized to rule on motions in limine pursuant to their authority to manage trials.

26 *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984).

27         A motion in limine is a request for the court's guidance concerning an evidentiary

28 question. *See Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999). Judges have broad

discretion when ruling on motions in limine. *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). However, a motion in limine should not be used to resolve factual disputes or weigh evidence. *See C & E Servs., Inc., v. Ashland, Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008). To exclude evidence on a motion in limine "the evidence must be inadmissible on all potential grounds." *See, e.g., Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT & T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). This is because although rulings on motions in limine may save "time, costs, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1219 (D. Kan. 2007).

In limine rulings are provisional. Such "rulings are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n. 3 (2000); *accord Luce*, 469 U.S. at 41 (noting that in limine rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner). "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted to trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

**B.    Summary Judgment**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  An issue is "genuine"

1  if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for

2  the nonmoving party and a dispute is "material" if it could affect the outcome of the suit

3  under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

4  Where reasonable minds could differ on the material facts at issue, however, summary

5  judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

6  1995). "The amount of evidence necessary to raise a genuine issue of material fact is

7  enough 'to require a jury or judge to resolve the parties' differing versions of the truth at

8  trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l*

9  *Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary

10  judgment motion, a court views all facts and draws all inferences in the light most

11  favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793

12  F.2d 1100, 1103 (9th Cir. 1986).

13       The moving party bears the burden of showing that there are no genuine issues

14  of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In

15  order to carry its burden of production, the moving party must either produce evidence

16  negating an essential element of the nonmoving party's claim or defense or show that

17  the nonmoving party does not have enough evidence of an essential element to carry its

18  ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

19  F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements,

20  the burden shifts to the party resisting the motion to "set forth specific facts showing that

21  there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may

22  not rely on denials in the pleadings but must produce specific evidence, through

23  affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME*

24  *Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show

25  that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285

26  F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a

27  scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*,

28  477 U.S. at 252.

1  **III.   MOTION IN LIMINE**

2  Goodman seeks to exclude evidence of a prior arrest, citation, and conviction

3  arising out of her arrest on suspicion of prostitution in 2007. Goodman previously worked

4  as an "outcall nude entertainer" in San Diego, and was arrested on suspicion of

5  prostitution while working in that capacity.[4] She was issued a misdemeanor citation for

6  solicitation of prostitution, and pled no contest to a charge of disturbing the peace. (Dkt.

7  no. 74-3 at 29.) A prostitution charge brought against her was dropped, apparently in

8  exchange for her plea. (Dkt. nos. 74-5 and 74-6.) Defendants seek to admit this

9  evidence primarily on account of Goodman's defamation claim, arguing that assessing

10 the veracity of any potential defamatory statement concerning Goodman as a prostitute

11 requires the evidence at issue here, since it is relevant to establishing whether Goodman

12 was in fact a prostitute — a complete defense to Goodman's defamation claim.

13 The Court holds that this evidence is inadmissible. First, the facts at issue are

14 minimally relevant to whether Goodman was a prostitute. She was never convicted of

15 prostitution; she was only arrested on suspicion of prostitution. Goodman's written

16 citation appears to be related to the prostitution charge, which was subsequently

17 dropped. Although an arrest for a prostitution-related offense might have some tendency

18 to make more probable the fact that Goodman *actually* engaged in prostitution, *see* Fed.

19 R. Evid. 401 (defining relevance), it is uniformly recognized that an arrest, without more,

20 is inadmissible to support the inference that the underlying act occurred. *See, e.g.*, 2

21 David W. Louisell & Christopher B. Mueller, *Federal Evidence* § 140 at 177 (1985)

22 (noting *Michelson v. United States*, 335 U.S. 469, 482 (1948) wherein the Court

23 concluded that "[a]rrest without more does not, in law any more than in reason, impeach

24 the integrity or impair the credibility of a witness. It happens to the innocent as well as

25 the guilty"). As an arrest "happens to the innocent as well as the guilty," the risk of

26 prejudice from this evidence's introduction is therefore great. *See* Fed. R. Evid. 403;

27 _____

28 [4]According to the record, an outcall nude entertainer essentially operates as an exotic dancer, but performs at locations requested by the client for special events.

9

1   *United States v. Bettencourt*, 614 F.2d 214, 218 (9th Cir. 1980) ("Balanced against the

2   minimal probative value of the fact of an arrest is the substantial, perhaps inherent,

3   prejudicial potential of such evidence for the jury."). This is particularly true where the

4   arrest occurred on January 31, 2007, over four years prior to the incident which gave rise

5   to this action. Accordingly, evidence of Goodman's prior arrest to establish that she in

6   fact engaged in acts of prostitution is excluded.

7         In addition to using this evidence to establish truthfulness of any alleged

8   defamatory statements, Defendants also seek its admission on the question of

9   defamation damages. Although Goodman's San Diego arrest may be minimally relevant

10  to her reputation at the time she was detained at the Cosmopolitan, reputational damage

11  is presumed in a slander *per se* action like this one, as explained below in the Court's

12  discussion of Goodman's defamation claim. *See Branda v. Sanford*, 637 P.2d 1223,

13  1225 (Nev. 1981) (recognizing that slander *per se* is actionable without a showing of

14  actual or "special" damages). This is because "[a]t the heart of the libel-and-slander-per-

15  se damage scheme lay the award of general damages for loss of reputation," which

16  "were granted *without special proof* because the judgment of history was that the content

17  of the publication itself was so likely to cause injury and because in many cases the

18  effect of defamatory statements is so subtle and indirect that it is impossible directly to

19  trace the effects thereof in loss to the person defamed." *Gertz v. Robert Welch, Inc.*, 418

20  U.S. 323, 372–73 (1974) (internal quotations omitted). As this is an action in which

21  damages to Goodman's reputation are presumed, the probative value of a prior arrest is

22  even less forceful. At the same time, the risk of undue prejudice remains as great as

23  ever.

24        In light of the foregoing, the Court holds that evidence of Goodman's prior arrest

25  is inadmissible to demonstrate that she engaged in the underlying act that resulted in her

26  arrest, and is further inadmissible on the question of her reputation at the time of the

27  incident challenged in this suit.

28  ///

## IV.     MOTION TO SEAL

Defendants move to seal the entire deposition transcripts of Defendants Segura and Signorello, arguing that pursuant to the protective order entered by the Court, sealing testimony related to "confidential VICE tactical operations procedures" is required in order to protect citizens of Las Vegas and prevent a compromise of existing and future Vice operations.

"[A] 'compelling reasons' standard applies to most [motions to seal] judicial records." *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 677–78 (9th Cir. 2010) (*quoting Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)) (other citation omitted). "This standard derives from the common law right 'to inspect and copy public records and documents, including judicial records and documents.'" *Id.* at 678 (*quoting Kamakana*, 447 F.3d at 1178). "To limit this common law right of access, a party seeking to seal judicial records must show that 'compelling reasons supported by specific factual findings . . . outweigh the general history of access and the public policies favoring disclosure.'" *Id.* (*quoting Kamakana*, 447 F.3d at 1178–79). "Factors to consider include, but are not limited to: 'the public interest in understanding the judicial process and whether disclosure of the material could result in improper use of the material for scandalous or libelous purposes or infringement upon trade secrets.'" *Golden Boy Promotions, Inc. v. Top Rank, Inc.*, No. 2:10-CV-01619, 2011 WL 686362, at *1 (D. Nev. Feb. 17, 2011) (quoting *Pintos*, 605 F.3d at 679 n.6).

Here, Defendants' motion to seal is overbroad and unsupported by "specific factual findings." They seek to seal the entire transcripts of the individual defendants but fail to demonstrate a compelling need to do so. To the extent that any individual portion of the transcripts requires protection from the public eye, Defendants must identify that portion and provide specific support demonstrating a compelling reason to do so. The Court denies Defendants' Motion, but will temporarily suspend unsealing the transcripts to give Defendants leave to file a renewed motion to seal portions of the two transcripts ///

1   that should be sealed for compelling reasons.   Such a motion must be filed within

2   fourteen (14) days.

3   **V.      SUMMARY JUDGMENT MOTIONS**

4          **A.      42 U.S.C. § 1983 (Fourth Amendment)**

5          Both Goodman and Defendants move for summary judgment on Goodman's

6   Fourth Amendment claim. Defendants dispute the merits of Goodman's constitutional

7   claim, and, in the alternative, contend that qualified immunity shields the individual

8   officers from liability and that Goodman's failure to establish a policy or practice of

9   unconstitutionality shields LVMPD from liability.

10         42 U.S.C. § 1983 provides a mechanism for the private enforcement of

11  substantive rights conferred by the Constitution and federal statutes. *Graham v. Connor*,

12  490 U.S. 386, 393–94 (1989). Section 1983 "'is not itself a source of substantive rights,'

13  but merely provides 'a method for vindicating federal rights elsewhere conferred.'"

14  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (*quoting Baker v. McCollan*, 443 U.S. 137,

15  144 n.3 (1979)). To state a claim under § 1983, a plaintiff "must allege the violation of a

16  right secured by the Constitution and the laws of the United States, and must show that

17  the alleged deprivation was committed by a person acting under color of law." *West v.*

18  *Atkins*, 487 U.S. 42, 48–49 (1988). Here, Goodman relies on substantive rights

19  conferred by the Fourth Amendment.

20         The undisputed facts in this case evidence that a seizure took place because

21  Goodman was detained by Defendants and was not free to leave. *See United States v.*

22  *Mendenhall*, 446 U.S. 544, 554 (1980) (recognizing that "a person has been 'seized'

23  within the meaning of the Fourth Amendment only if, in view of all of the circumstances

24  surrounding the incident, a reasonable person would have believed that he was not free

25  to leave"). For clarity, the Court analyzes the incident by breaking up the events into their

26  three constitutive parts: (1) Defendants' initial contact with and detention of Goodman;

27  (2) Defendants' continued detention of Goodman beginning with her transport to the

28  security office; and (3) Defendants' seizure and potential search of Goodman's purse.

1
2

### 1. Whether Goodman's initial detention was supported by reasonable suspicion

3     The parties analyze Goodman's initial detention under the rubric set out by the

4  Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), for investigatory stops. A warrantless

5  investigatory stop or encounter does not violate the Fourth Amendment if the officers

6  have "reasonable suspicion supported by articulable facts that criminal activity 'may be

7  afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (*quoting Terry*, 392 U.S. at 30).

8  "In deciding whether a stop was supported by reasonable suspicion, the court must

9  consider whether 'in light of the totality of the circumstances, the officer had a

10 particularized and objective basis for suspecting the particular person stopped of criminal

11 activity.'" *United States v. Basher*, 629 F.3d 1161, 1165 (9th Cir. 2011) (*quoting United

12 States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007)). Simply put, the Court

13 must "consider all the factors on which an officer relied in combination, rather than

14 separately," in making this determination.  *Johnson v. Bay Area Rapid Transit Dist.*, __

15 F.3d __, 2013 WL 3888840, at *11 (9th Cir. July 30, 2013).

16    "[T]he question of whether a reasonable officer could have believed probable

17 cause (or reasonable suspicion) existed to justify a search or an arrest is 'an essentially

18 legal question' that should be determined by the district court at the earliest possible

19 point in the litigation." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)

20 (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Where the underlying facts are

21 undisputed, a district court must determine the issue on motion for summary judgment."

22 *Id.*

23    Defendants point to the following facts to demonstrate that their detention of

24 Goodman was justified as a *Terry* stop:[5]

25

26        [5]In their motions for summary judgment, Defendants also cited as support the
allegation that Goodman works as a dancer at a strip club, a profession which lends
27 itself to prostitution. However, Goodman argues that Defendants would not have known
this fact when they detained her.  During oral argument, Defendants' counsel conceded
28 that the two officers would not have known Goodman's profession at that time.

1.  Goodman "walked by the hotel elevators," an area where prostitutes ordinarily convene. (Goodman argues that she was walking, not loitering, to a restaurant for dinner, and whether or not she was near the elevators is irrelevant.)

2.  Goodman was dressed provocatively. (Goodman noted that she was dressed relatively conservatively for Las Vegas, testifying that she wore a romper suit with sleeves.[6])

3.  One of the Vice detectives who engaged the two women recognized Mosafer as having been detained for prostitution four days earlier. (Goodman notes that Mosafer was released without charge.)

4.  An ongoing investigation was occurring in the Cosmopolitan relating to the activities of a well-known pimp, "Wheelchair Mike," Mosafer's husband.

5.  The two women were holding and using mobile phones, which, in the officer's experience, could be used both as mechanisms to communicate with co-conspirators and as weapons or weapon-concealing devices.

In reviewing these facts, the Court is mindful that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Arvizu,* 534 U.S. 266, 273 (2002). Nevertheless, an officer's objectively unreasonable determination justifying a *Terry* stop is entitled to no deference. Here, the totality of the circumstances, even accepting Defendants' allegations as true, do not reasonably support the Vice officers' suspicion that criminal activity was afoot.

First, Defendants claim that the Cosmopolitan was overrun by prostitutes, and that the casino floor near the elevators was an area with a particularly high concentration of prostitute activity. This fact, even taken as true, cannot on its own support reasonable suspicion for the simple reason that it would register as suspicious *all* visitors to the

---

[6]A romper is a "a fashionable, loose-fitting woman's garment combining esp[ecially] a short-sleeved or sleeveless top and wide-legged shorts." OXFORD ENGLISH DICTIONARY (3d ed. 2010).

casino. While the officers' own judgment as to the relative concentration of prostitution activity in particular areas of the casino is entitled to some deference, it cannot be that walking past the elevators in a casino floor, as Defendants claim happened, subjects the many female passersby to suspicion.

Similarly, that Goodman was dressed "provocatively" and carrying a cell phone threatens to scoop up many, if not most, women visiting the Cosmopolitan at the time. Even assuming that "provocative" clothing is susceptible to coherent categorization — a dangerous undertaking in its own rights — it is far from clear that Goodman was wearing a provocative dress. In fact, she characterized her outfit as relatively conservative. But even that point is irrelevant: Goodman's choice of dress bears no rational relationship to any suspicion of prostitution, even if it was somehow objectively "provocative." Defendants do not cite to any case law to the contrary. While it may be less likely that a conservatively dressed individual is operating as a prostitute, the opposite cannot be true. Employing as a factor in the reasonable suspicion analysis the wearing of revealing clothing alone, without any overt conduct, risks criminalizing styles of dress that women have a right to wear, regardless of the surrounding circumstances.

Particularly puzzling is the officers' apparent attempt to justify Goodman's ongoing detention based on her wielding of a mobile phone. Defendants do not expressly cite the cell phone as justification for the *Terry* stop, but argue that it warranted seizure in a pat-down search as a weapon. Because Goodman began to send a text message to her boyfriend as the Vice detectives approached her, the visible use of the mobile phone contributed to Defendants' suspicion of wrongdoing. Indeed, Defendant Segura testified that mobile phones may be used as weapons, and are "vital to girls who make contact with either dates or possible pimps," thereby justifying their seizure and heightening the scrutiny they placed on Goodman and her friend. (*See* dkt. no. 84-3 at 31:3-4.) But merely because an item of such ubiquity *may* be used recklessly or dangerously does not justify its use as an aggravating factor in a police officer's suspicion calculation. Indeed, the criteria that Defendants attempt to use to explain the seizure of Goodman's

mobile phone (it can conceal a weapon, or it can be used as a weapon) also excuses the seizure of a handkerchief (concealing a weapon) or high-heeled shoes (a sharp weapon). As with the clothing argument, this logic threatens to characterize many, if not most, of the Cosmopolitan's clientele as weapon-toting objects of suspicion. Otherwise, a mobile phone is as much a dangerous weapon as are high-heeled shoes or a solid glasses case: each of these items, when hurled with reckless abandon, may injure upon contact. It would be irrational per Defendants' logic to signal out a cell phone as justification for a *Terry* stop or search, but ignore Goodman's shoes on her feet.

In sum, all but one fact, discussed below, fail to raise, singly or jointly, any reasonable suspicion of wrongdoing. Precisely because these pieces of information are not rationally limited to individuals who might be more likely than any others to be engaged in prostitution or solicitation, the Court does not weigh them heavily in the *Terry* analysis. The remaining fact of importance is Goodman's association with Mosafer, a woman identified by Vice detectives as having been arrested, but not charged, on suspicion of solicitation and apparently known to be married to a well-known pimp. Having determined that Goodman's appearance and location creates minimal, if any, suspicion of wrongdoing, the added fact that she met her friend previously arrested for prostitution does not tip the scale in favor of *Terry* stop. It cannot be that dining out with a friend who happens to have been at one time suspected of prostitution and married to a pimp automatically renders one a target of an investigatory detention. Otherwise, Mosafer's previous arrest and marital relationship would have the ignominious result of rendering all of her friends susceptible to automatic detentions merely by association. *Cf. Ybarra*, 444 U.S. at 91 ("But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). Moreover, considering all the factors that the Vice officers relied upon in combination and viewing the facts in the light most favorable to Defendants, the Court finds that they are insufficient to arouse suspicion in support of Defendants' *Terry* stop.

This was not a situation where the individual officers observed any activity rationally related to prostitution. Indeed, Defendants' counsel conceded at oral argument that the officers did not have much opportunity to converse with Goodman and her friend for fear that Mosafer may have recognized Signorello. Even viewing all facts in the light most favorable to Defendants, the Court is left to conclude that the individual officers acted on a mere hunch and in a hurried manner because of the concern that Mosafer may have recognized them, and purported to justify their actions with facts as likely to ensnare innocent women as to unearth criminals. Courts that have upheld reasonable suspicion in many prostitution cases did so because the detainee was observed interacting with a prospective client in a manner that raised the suspicion of solicitation. *See, e.g.*, *United States v. Luqman,* 522 F.3d 613, 617 (6th Cir. 2008) (finding reasonable suspicion that defendant solicited prostitution "when the woman who had approached [his] truck ran back to the corner, and [his] truck moved forward, as the police vehicle approached"); *United States v. Cross*, 3:09-CR-002-TMB-JDR, 2009 WL 1444028, at *3 (D. Alaska May 1, 2009) *adopted by* 3:09-CR-0002 TMB, 2009 WL 1444087 (D. Alaska May 20, 2009) *aff'd*, 421 F. App'x 720 (9th Cir. 2011) (investigatory detention of suspected prostitute justified because it occurred in known center for prostitution, occurred at night, and suspect appeared to be directly soliciting a client).  No such act approximating solicitation was even alleged to have occurred here.  Defendants do not dispute that the officers engaged Goodman in their undercover capacity, and do not claim that Goodman engaged in any activity that may be reasonably construed as an attempt to solicit them or anyone else.[7]  Nor do Defendants dispute Goodman's testimony that she expressly rebuffed the officers' advances, and rejected any attempt to engage in any activity reasonably relating to prostitution or solicitation. Conversely, bundling together innocuous acts to justify detaining an individual, as Defendants do

_____

[7]Goodman's only act was, according to Defendants, to send a text message on her mobile phone. As explained above, messaging another via cell phone cannot, in this situation, reasonably be understood as a prelude to prostitution or solicitation.

1   here, has been held insufficient to sustain a *Terry* stop. *See United States v. Miller*,

2   CR10-06 RE, 2010 WL 5173278, at *3 (D. Or. Dec. 15, 2010) ("In sum, a single female,

3   dressed in jeans and sweater, strolling in a high vice area at 3:30 p.m. who makes eye

4   contact with a driver, looks at traffic, and enters a parked car, all in less than sixty

5   seconds, does not raise a reasonable suspicion that she is engaged in prostitution

6   activity.").

7       Goodman's detention therefore cannot withstand the constitutional scrutiny set

8   out in *Terry* for an investigatory stop. The facts used by Defendants to justify her stop

9   were not reasonably likely to create any suspicion of criminal activity.

10
11              **2.      Whether Goodman's initial detention was transformed into a *de
                          facto* arrest**

12      In addition to Defendants' unconstitutional *Terry* stop, the Fourth Amendment was

13   also violated when Goodman's detention transformed from a brief, investigatory

14   detention into a *de facto* arrest.

15      When a detention exceeds the scope of a permissible *Terry* stop — that is,

16   something more than "a brief stop, interrogation, and under the proper circumstances, a

17   brief check for weapons" — it has become a *de facto* arrest that requires probable cause.

18   *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001). "There is 'no bright-line rule

19   to determine when an investigatory stop becomes an arrest.'" *United States v. Parr,* 843

20   F.2d 1228, 1231 (9th Cir. 1988) (*quoting United States v. Hatfield*, 815 F.2d 1068, 1070

21   (6th Cir. 1987)). Rather, in determining whether stops have turned into arrests, courts

22   consider the "totality of the circumstances." *United States v. Del Vizo*, 918 F.2d 821, 824

23   (9th Cir. 1990) (*quoting United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1988)). "In

24   assessing whether a detention is too long in duration to be justified as an investigative

25   stop, we consider it appropriate to examine whether the police diligently pursued a

26   means of investigation that was likely to confirm or dispel their suspicions quickly, during

27   which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S.

28   675, 686 (1985). "As might be expected, the ultimate decision in such cases is fact-

specific." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). "[W]e decide whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances.*" *Id.* at 1185.

The Court holds that Goodman's detention was transformed from a brief, investigatory stop to a *de facto* arrest. First, although the time of the detention is indeterminate, Goodman testified that based on her recollection and her telephone records, the detention was either two hours or slightly less than two hours long. (*See, e.g.*, dkt. no. 84-1 at 122–23, 176.) On the other hand, Defendants Segura and Signorello failed to recall the duration of her detention, and instead offer blanket denials that Goodman's detention lasted anywhere near two hours. (Dkt. no. 84-2 at 97; 84-3 at 53.) Although Defendants characterize Goodman's testimony as "unsupported," they fail to provide any evidence of the detention's length. Instead, they ask the Court to disregard Goodman's sworn statements in favor of their blanket denials. Because Defendants "may not rely on denials . . . to show that [a] dispute exists," *Bhan*, 929 F.2d at 1409, and cannot only attempt to conjure up "some metaphysical doubt as to the material facts," *Orr*, 285 F.3d at 783, the Court declines to decide as a matter of law that the duration of Goodman's arrest is in dispute. Where Goodman cites a fact, supported by a sworn statement and based on personal knowledge, and Defendants simply deny the veracity of that fact, no genuine issue of material fact is created — even if Goodman's recollection of that fact is hazy or susceptible to some doubt. Thus, for the purposes of deciding these Motions, the Court determines that Goodman's detention was somewhere between one to two hours long.

Although no *per se* duration exists at which a *Terry* stop ends and an arrest commences, a 20-minute confinement has been held too lengthy to be appropriately characterized as an investigatory detention. *Sharpe*, 470 U.S. at 686 (overturning a Court of Appeals decision and ruling that a 20-minute detention was reasonable under *Terry* because the police acted diligently and a suspect's actions contribute to the added

delay); *see also United States v. Perez-Esparza*, 609 F.2d 1284, 1287 (9th Cir. 1979) (holding that detention for three hours in a checkpoint station required probable cause). Instances in which a lengthy delay of over one hour or more have been justified on reasonable suspicion alone relied on distinguishable facts not present here. *See, e.g.*, *United States v. Hodoyan-Palacios*, 993 F. Supp. 789, 793 (S.D. Cal. 1998) (detention over two hours reasonable when government agents acted swiftly and confronted "a high-level dangerous situation where an alleged assassin of a large criminal organization present[ed] . . . immediate potential threat to public safety and welfare"); *United States v. Richards*, 500 F.2d 1025, 1029 (9th Cir. 1974) ("[W]here the suspects' own unsatisfactory responses to legitimate police inquiries were the principal cause of the extended detainment, the delay of slightly over an hour was not unreasonable."). No such facts were present here, and no reasonable basis for detaining Goodman longer than one hour existed.

In addition to its duration, the officers physically handled Goodman and Mosafer and escorted them to a private security facility, a factor that suggests an arrest rather than a brief, investigatory pat-down or detention. The forced relocation of the suspects is a factor that weighs in favor of an arrest finding. *Washington*, 98 F.3d at 1189 (noting that "whether the police physically restrict the suspect's liberty is an important factor in analyzing" whether an arrest occurred). With the option of identifying themselves on the casino floor and conducting their investigation at the scene of their contact with Goodman, Defendants chose instead to forcibly relocate the women and house them in what essentially became a detention facility pending further investigation. This approximates an arrest rather than a brief *Terry* stop.

In addition, the time spent detaining Goodman and the type of interaction she had with her detaining officers did not evidence a diligent investigation. Though the officers attempted to engage Goodman or Mosafer in some questioning, they did not appear to be interested in limiting the amount of time she spent in detention. At least a few questions were asked of Goodman, including her current employment and the reason

1   why she was in the Cosmopolitan, and it appears from Segura's deposition testimony

2   that a warrant check was conducted for Goodman. (*See* dkt. no. 84-3 at 50.) It is not

3   clear, however, that the delays in investigating Goodman while holding her in the room

4   were necessary in light of the apparently minimal questioning conducted by Defendants.

5          On the other hand, that Defendants did not appear to use any particularly

6   aggressive tactics in their detention of Goodman weighs against a finding of an arrest.

7   With the possible exception of grabbing Goodman's arm, Vice officers did not handcuff

8   her, draw weapons, or otherwise initiate aggressive physical contact in the course of

9   Goodman's detention.

10         Nevertheless, even viewing the facts in the light most favorable to Defendants,

11  the Court concludes that Defendants effectuated an arrest of Goodman. Balancing the

12  undisputed facts available to the Court that support an arrest finding (Goodman's lengthy

13  detention, her physical relocation, her light questioning) with those that do not (her

14  relatively peaceful detention) reveals that a detention of longer than one hour was not

15  reasonably necessary to effectuate the purpose of a *Terry* stop, even assuming that

16  such a stop was justified.

17                **3.      Seizure and search of Goodman's cell phone and purse**

18         Goodman also complains of a Fourth Amendment violation in the seizure and

19  search of her cell phone and purse. For the same reasons that Defendants' stop of

20  Goodman was unlawful, their interference with her property rights in her purse and cell

21  phone also violated the Fourth Amendment.

22         A "seizure" of property occurs when "there is some meaningful interference with

23  an individual's possessory interests in that property." *Soldal v. Cook Cnty., Ill.*, 506 U.S.

24  56, 68 (1992). "In the ordinary case, the Court has viewed a seizure of personal property

25  as *per se* unreasonable within the meaning of the Fourth Amendment unless it is

26  accomplished pursuant to a judicial warrant issued upon probable cause and particularly

27  describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983).

28  Warrants are not required, however, "if the exigencies of the circumstances demand it or

1  some other recognized exception to the warrant requirement is present," such as when

2  weapons are present in a public space or to protect an officer. *Id.*

3      Whether the seizures and possible search are justified here depends on the

4  categorization of Goodman's detention. Because no justification for Goodman's arrest

5  existed (and therefore no valid search incident to an arrest was effectuated),

6  Defendants' search and seizure of Goodman's purse would only be valid if it was the

7  type of pat-down search authorized by *Terry*. "In *Terry* the Court first recognized 'the

8  narrow authority of police officers who suspect criminal activity to make limited intrusions

9  on an individual's personal security based on less than probable cause.'" *Place*, 462

10  U.S. at 702 (*quoting Michigan v. Summer*, 452 U.S. 692, 698 (1981)). "*Terry* allows for a

11  limited search of a suspect's person in order for the officer 'to determine whether the

12  person is in fact carrying a weapon.'" *United States v. Mattarolo*, 209 F.3d 1153, 1158

13  (9th Cir. 2000) (*quoting Terry*, 392 U.S. at 24). Searches incident to a *Terry* stop are

14  therefore quite limited. For that reason, "[n]othing in *Terry* can be understood to allow a

15  generalized 'cursory search for weapons' or indeed, any search whatever for anything

16  but weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979). "The standards traditionally

17  governing a search incident to lawful arrest are not, therefore, commuted to the stricter

18  *Terry* standards . . . ." *United States v. Robinson*, 414 U.S. 218, 234 (1973).

19      Accordingly, the validity of Defendants' searches of property do not necessarily

20  rise and fall with the validity of Goodman's detention; a valid *Terry* stop may

21  nevertheless be accompanied by an unconstitutional search. But where a *Terry* stop is

22  invalid, it is nearly impossible for the seizure of property incident to that stop to be

23  constitutional. Here, the illegal detention and arrest of Goodman necessarily invalidates

24  Defendants' attendant search of her cell phone and purse. This is true regardless of

25  whether Goodman consented to the purse search, as Defendants' argue, for consent to

26  its search did not remove the taint of the unauthorized detention and arrest. *See United*

27  *States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1299 (9th Cir. 1988) (recounting test for

28  determining whether evidence gathered during a consensual search after an illegal stop

1    must be excluded). Here, no consent could have been given under the circumstances,

2    because it was extracted during an ongoing unconstitutional detention. *See also United*

3    *States v. Hernandez-Mendez*, 626 F.3d 203, 212 (4th Cir.2010) (stating that *Terry* does

4    not permit the search of a person's purse simply to locate photographic identification, but

5    that the reasonableness of a *Terry* frisk is not judged on the basis of the officer's

6    subjective intent).

**4.    LVMPD's Liability under *Monell***

8        Having concluded that Defendants violated Goodman's constitutional rights when

9    they detained her and seized her property, the Court must now determine whether

10   LVMPD may be liable for the acts of the individual defendants.

11       "A government entity may not be held liable under 42 U.S.C. § 1983, unless a

12   policy, practice, or custom of the entity can be shown to be a moving force behind a

13   violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir.

14   2011) (*citing Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658, 694

15   (1978)). "In order to establish liability for governmental entities under Monell, a plaintiff

16   must prove '(1) that [the plaintiff] possessed a constitutional right of which he was

17   deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate

18   indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving

19   force behind the constitutional violation.'" *Dougherty*, 654 F.3d at 900 (*quoting Plumeau*

20   *v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir.1997)).

21       Failure to train may amount to a policy of "deliberate indifference," if the need to

22   train was obvious and the failure to do so made a violation of constitutional rights likely.

23   *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Similarly, a failure to supervise that is

24   "sufficiently inadequate" may amount to "deliberate indifference." *Davis v. City of*

25   *Ellensburg*, 869 F.2d 1230, 1235 (9th Cir.1989). Mere negligence in training or

26   supervision, however, does not give rise to a *Monell* claim. *Id.*

27       Goodman does not provide any citation to evidence supporting the existence of a

28   policy or custom to engage in these types of detentions, seizures, and searches. In her

response to Defendants' summary judgment motions, Goodman writes that Signorello "testified that in casino sweeps for prostitutes . . . all persons subject to a *Terry* stop are taken into custody within the casino security office," but does not provide a citation for this statement. Nevertheless, both Signorello and Segura discussed in their depositions and during their internal affairs investigation Vice's protocols when conducting anti-prostitution sweeps. Goodman's detention came in the midst of the sweep, which Vice apparently performs regularly. Signorello further testified in his deposition that *Terry* stops in these prostitution sweeps typically involve detention and relocation to a secured facility, unless an extreme circumstance involving an argumentative subject requires an arrest at the point of initial contact. (Dkt. no. 84-2 at 59:19–24.) This testimony suggests that LVMPD custom during prostitution sweeps is to detain individuals in approximately the same manner as Goodman. In addition, that Vice sweeps are often "chaotic" and conducted very quickly creates precisely the type of policy that might encourage a "detain first, ask questions later" approach that entangled Goodman in this particular circumstance. This fact is compounded by testimony that suggests LVMPD does not typically monitor the duration of detainees' confinement, and likely has no way to ensure that detentions are managed efficiently with appropriate respect for their detainee's constitutional rights.

Signorello also testified that pursuant to LVMPD policy, a seizure and search of purses occurs during every prostitution sweep, irrespective of the need to identify the detainee. (Dkt. no. 84-2 at 50, 53–54.) Goodman's detention, along with that of the numerous other prostitution suspects on the same evening, appears to have been enacted consistent with this Vice procedure. Accordingly, these facts defeat LVMPD's attempt to secure summary judgment notwithstanding the individual officers' unconstitutional conduct.

Nevertheless, Goodman's competing request for summary judgment against LVMPD must also be denied.  A number of outstanding factual issues prevent the Court from issuing a decision as a matter of law in favor of Goodman, including whether

LVMPD's detention of Goodman is consistent with their policy and practice in conducting prostitution sweeps, whether Goodman's unconstitutional detention and arrest is but a "single constitutional deprivation" insufficient to render a judgment against a municipality, *see Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999),[8] or what role Vice prostitution sweeps play in encouraging or sanctioning unconstitutional *Terry* stops. The facts cited above may support the conclusion that the nature and structure of prostitution sweeps result in hurried situations that prevent officers from constitutionally evaluating whether a target's conduct is susceptible to reasonable suspicion of wrongdoing. However, Goodman has failed to demonstrate as a matter of law that LVMPD policy causes officers to miscalculate their justification for performing a *Terry* stop, or that the policy results in officers impermissibly arresting detainees without probable cause. Because enough facts have been raised to create a genuine dispute on the issue, summary judgment at this stage is therefore inappropriate.

### 5.   Individual Defendants' Qualified Immunity

Where a plaintiff has stated a valid cause of action under § 1983, government officials sued in their individual capacities may raise the affirmative defense of qualified or absolute immunity. *See Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th Cir. 2005). The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This immunity is granted broadly and "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998) (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "When a law enforcement officer asserts qualified immunity

---

[8]Importantly, Goodman does not argue that any misconduct levied against her was the result of an act or ratification by an official with final policymaking authority. *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013). In the absence of such a showing, Goodman must rest her *Monell* claim either on official policy or a long-standing practice or custom of constitutional violations which cannot be demonstrated through reference to a single act. *Id.*

1    from liability for Fourth Amendment violations, the district court must determine whether,

2    in light of clearly established principles governing the conduct in question, the officer

3    objectively could have believed that his conduct was lawful." *Watkins v. City of Oakland*,

4    *Cal.,* 145 F.3d 1087, 1092 (9th Cir. 1998).

5          "Qualified immunity balances two important interests — the need to hold public

6    officials accountable when they exercise power irresponsibly and the need to shield

7    officials from harassment, distraction, and liability when they perform their duties

8    reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "[Q]ualified immunity

9    applies regardless of whether the government official's error is a mistake of law, a

10   mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citations

11   omitted). Qualified immunity shields government officials from "civil damages liability as

12   long as their actions could reasonably have been thought consistent with the rights they

13   are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citations

14   omitted).

15         Because the Court has determined that Defendants Segura and Signorello

16   violated Goodman's Fourth Amendment right to be free from unreasonable search and

17   seizure, the remaining question is whether the right was clearly established at the time of

18   the violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("[I]f a [constitutional]

19   violation could be made out on a favorable view of the parties' submissions, the next,

20   sequential step is to ask whether the right was clearly established."); *accord Pearson*,

21   555 U.S. at 236. Moreover, the Court must resolve any disputed facts in Goodman's

22   favor. *See Johnson*, 2013 WL 3888840, at *1.

23         "A [g]overnment official's conduct violates clearly established law when, at the

24   time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every

25   'reasonable official would have understood that what he is doing violates that right.'"

26   *Ashcroft v. al-Kidd,* —— U.S. ——, 131 S. Ct. 2074, 2083 (2011) (quotation marks and

27   citation omitted). "[T]he right allegedly violated must be defined at the appropriate level

28   of specificity before a court can determine if it was clearly established." *Dunn v. Castro,*

621 F.3d 1196, 1201 (9th Cir. 2010). However, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083.

The right intruded upon by the Vice officers — the right to be free from an unreasonable detention supported by the flimsiest of facts — is well established. As discussed above, the common current running through the prostitution cases where reasonable suspicion existed was the presence of an act that approximates or portends solicitation. *See Luqman,* 522 F.3d at 617 (defendant approached car as if to solicit customer); *Cross*, 2009 WL 1444028, at *3 (defendant appeared to be directly soliciting a client); *United States v. Martin*, 289 F.3d 392, 399 (6th Cir. 2002) (defendant "waved in a manner that [the officers] identified as being characteristic of a prostitute's means of soliciting customers"); *United States v. Green*, 157 F. App'x 853, 856 (6th Cir. 2005) (unpublished opinion) (defendant leaned close to passenger side of a car, then walked away as police car approached); *United States v. Bacote*, No. 05-234 (MJD/SRN), 2006 WL 1579998, at *5 (D. Minn. June 2, 2006) *aff'd*, 266 F. App'x 497 (8th Cir. 2008) (defendant discussed performing sex acts for money with undercover officer posing as prostitute).

Here, no such act occurred. In fact, based on Goodman's account of the facts, which the Court must accept in considering the individual defendants' motion, she rebuffed the Vice officers' advances when they attempted to approach her as she and Mosafer were walking towards the Henry and again afterward. The officers then detained her after possibly several more unsuccessful attempts at solicitation. Goodman's conduct cannot be reasonably construed to arouse any suspicion. Even viewing the facts as alleged by Defendants, the officers attempted to solicit Goodman in their undercover capacity and they were not successful. They were concerned that Mosafer may have recognized Signorello, which prompted their detention of the women. The surrounding circumstances do not create an objectively reasonable basis for a *Terry* ///

1  stop, let alone for a lengthy arrest. *See Miller*, 2010 WL 5173278, at *3. This much has

2  been clearly established.

3      Accordingly, Signorello and Segura cannot receive the benefit of qualified

4  immunity in this case, where the facts are not susceptible to a reasonable conclusion

5  that Goodman's stop was constitutional. Defendants' motion for summary judgment on

6  the issue of qualified immunity is therefore denied.

7      **B.    State law claims**

8      On the remaining state law claims, Defendants rest their summary judgment

9  request primarily on the discretionary function exception to Nevada's waiver of sovereign

10  immunity, arguing that Nevada precludes an officer's liability for state law torts

11  committed as a result of discretionary actions.

12      Although Nevada has generally waived its state immunity under NRS § 41.031,

13  the State has retained immunity under NRS § 41.032 for officials exercising discretion.

14  NRS § 41.032(2) states no actions may be brought against an officer of the State or its

15  political subdivision that is "[b]ased upon the exercise or performance or the failure to

16  exercise or perform a discretionary function or duty." On its face, this statute does not

17  immunize municipal governments or their employees because municipalities are

18  considered independent corporations or "persons" with their own identities, not mere

19  political subdivisions of a state. *See Monell*, 436 U.S. at 690. The Nevada Supreme

20  Court, however, has implicitly assumed that municipalities are political subdivisions of

21  the State for the purposes of applying the discretionary act immunity statute. *See, e.g.*,

22  *Travelers Hotel, Ltd. v. City of Reno*, 741 P.2d 1353, 1354-55 (Nev. 1987).

23      In determining whether immunity applies under NRS § 41.032, the Nevada

24  Supreme Court has adopted the general principles of federal jurisprudence as to

25  discretionary-function immunity, holding that the actions of state officers are entitled to

26  discretionary-function immunity if their decision (1) involves an element of individual

27  judgment or choice and (2) is based on considerations of social, economic, or political

28  policy. *Martinez v. Maruszczak*, 168 P.3d 720, 727, 729 (Nev. 2007). Decisions at all

1   levels of government, including routine decisions, may be protected by discretionary-

2   function immunity so long as both criteria are satisfied. *Id.* at 729. Additionally, "the

3   discretionary function exception protects agency decisions concerning the scope and

4   manner in which [the agency] conducts an investigation so long as the agency does not

5   violate a mandatory directive." *Vickers v. United States*, 228 F.3d 944, 951 (9th Cir.

6   2000). In analyzing discretionary-function immunity, a court does not ask whether the

7   official abused his or her discretion, but only whether the acts concerned a matter in

8   which the official had discretion. *See* NRS § 41.032(2).

9        "A law enforcement officer is generally afforded discretionary-function immunity in

10  conducting an investigation and effectuating an arrest so long as the officer does not

11  violate a mandatory directive in doing so." *Sandoval v. Las Vegas Metro. Police Dept.*,

12  854 F. Supp. 2d 860, 880 (D. Nev. 2012) (*citing Hart v. United States*, 630 F.3d 1085,

13  1090 (8th Cir. 2011) ("We readily conclude a federal law enforcement officer's on-the-

14  spot decisions concerning how to effectuate an arrest — including how best to restrain,

15  supervise, control or trust an arrestee — fall within the discretionary function exception to

16  the FTCA absent a specific mandatory directive to the contrary.") (other citations

17  omitted)).

18       "However, acts which violate the Constitution are not discretionary." *Jarvis v. City

19  of Mesquite Police Dept.*, No. 09-CV-00851, 2012 WL 600804, at *5 (D. Nev. Feb. 23,

20  2012) (*citing Nurse v. United States,* 226 F.3d 996, 1002 (9th Cir. 2000) ("In general,

21  governmental conduct cannot be discretionary if it violates a legal mandate.")); *see also

22  U.S. Fid. & Guar. Co. v. United States,* 837 F.2d 116, 120 (3d Cir. 1988) (stating that

23  "conduct cannot be discretionary if it violates the Constitution, a statute, or an applicable

24  regulation" because federal officials "do not possess discretion to violate constitutional

25  rights or federal statutes").

26       Because Defendants did violate the Constitution, and did so in a manner that

27  renders Signorello and Segura unable to avail themselves of the qualified immunity

28  defense, the discretionary function exception to Nevada's waiver of sovereign immunity

1  will not shield them from state liability. *Nurse*, 226 F.3d at 1002 n.2 (9th Cir. 2000)

2  (holding that "the Constitution can limit the discretion of federal officials such that the

3  FTCA's discretionary function exception will not apply"). Accordingly, the Court turns to

4  analyze each of the state law torts, each of which turns on whether Goodman's

5  detention and arrest were justified.

<b>1.    False imprisonment</b>

6

7      "To establish false imprisonment of which false arrest is an integral part, it

8  is . . . necessary to prove that the person be restrained of his liberty under the probable

9  imminence of force without any legal cause or justification." *Marschall v. City of Carson*,

10  464 P.2d 494, 497 (Nev. 1970). "[A]n actor is subject to liability to another for false

11  imprisonment 'if (a) he acts intending to confine the other or a third person within

12  boundaries fixed by the actor, and (b) his act directly or indirectly results in such a

13  confinement of the other, and (c) the other is conscious of the confinement or is harmed

14  by it.'" *Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981) (*quoting* Restatement

15  (Second) of Torts § 35 (1965)).

16      The significant overlap between the Fourth Amendment analysis and the false

17  imprisonment/false arrest claim compels summary judgment in favor of Goodman on this

18  claim. Having established that no "legal cause or justification" existed for detaining and

19  arresting Goodman, the essential elements for a false imprisonment claim are met: (1)

20  Defendants intended to confine Goodman during the course of her detention and arrest;

21  (2) their actions directly caused the confinement; and (3) Goodman was aware that she

22  was being confined and was not free to leave. That her detention was particularly

23  lengthy, and could not survive under Nevada law, lends additional support to this

24  position. *See* NRS § 171.123(4) (limiting temporary detentions to only a time "that is

25  reasonably necessary to effect the purposes of this section, *and in no event longer than*

26  *60 minutes*" (emphasis added)).  The Court thus grants Goodman's request for summary

27  judgment on this claim.

28  ///

### 2.    Battery

Defendants' primary argument in support of summary judgment on Goodman's battery claim relates to the discretionary function exception to NRS § 41.032. As explained above, that exception does not apply in this case.

To demonstrate a battery, "a plaintiff must show that the defendant (1) intended to cause harmful or offensive contact or an imminent apprehension of such a contact, and (2) offensive contact occurred." *Sandoval*, 854 F. Supp. 2d at 882. "In the context of an arrest, contact may only constitute an assault or battery if the officer used unreasonable force in effectuating the arrest." *Id.* (*citing Yada v. Simpson*, 913 P.2d 1261, 1262-63 (1996)). Here, no question of fact exists as to whether the officers' conduct was reasonable. It was not. What remains to be decided is the nature and scope of Defendant Segura's touching (or threat of touching) of Goodman, a fact-specific inquiry ill-suited for determination by the Court as a matter of law.[9] Summary judgment on this claim is denied.

### 3.    Defamation

In opposition to Defendants' Motions, Goodman argues that her forced relocation to the Cosmopolitan's security office, in the presence of Cosmopolitan staff and third parties, amounted to defamation by pantomime because it communicated to others that Goodman was a prostitute.

In order to succeed on her defamation claim, a plaintiff must show that "(1) a false and defamatory statement by defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 462 (Nev. 1993). "Certain classes of defamatory statements are considered so likely to cause serious injury to reputation and pecuniary loss that these statements are actionable without proof of

---

[9]As Defendants correctly point out, there is no allegation that Signorello performed the complained-of physical contact. Therefore, only Segura (and LVMPD) may be liable for battery.

damages." *K-Mart Corp. v. Washington*, 866 P.2d 274, 282 (Nev. 1993). These statements, known historically as defamation *per se*, involve: "(1) the imputation of a crime; (2) the imputation of having a loathsome disease; (3) imputing the person's lack of fitness for trade, business, or profession; and (4) imputing serious sexual misconduct." *Id.*

Here, questions of fact preclude granting summary judgment on the defamation claim. First, Goodman's escorting from the casino floor to the Cosmopolitan's security office raises the potential for a defamation by pantomime communicated to other visitors of the casino. *K-Mart Corp*, 866 P.2d at 283 ("The imputation of shoplifting, by words or by pantomime, if communicated to a third party, is unquestionably slander per se."). Of course, that Segura and Signorello were operating undercover during the prostitution sweep is a fact that may mitigate the power of their statement made after they revealed themselves to Goodman. It may even preclude a fact-finder from determining that a publication to others was made at all, since the act of plain-clothed officer escorting an individual may, under these circumstances, be found not to be defamatory. But because a jury may nevertheless reasonably find otherwise, the Court denies Defendants' request for judgment on this claim. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1148 (9th Cir. 2012) (reversing district court's award of summary judgment on defamation claim in favor of defendants who handcuffed plaintiff and escorted her off the casino floor).

Second, Defendants' detention of Goodman in the Cosmopolitan security room also creates a material question of fact as to defamation by pantomime. Presence inside the security facility, used at the time to house suspected prostitutes, creates an impression that the detainee is being justifiably held on suspicion of solicitation. *See K-Mart Corp.*, 866 P.2d at 281-82 ("A statement is defamatory when it would tend to lower the subject in the estimation of the community, excite derogatory opinions about the subject, and hold the subject up to contempt."). Because damages are presumed in a slander *per se* situation, and because her detention in the security room communicated her alleged criminal activity to others present at the time, Goodman has raised genuine

1    issues of material fact sufficient to defeat Defendants' summary judgment request on her

2    defamation claim.

3                    **4.    Intentional infliction of emotional distress**

4            Goodman's final state law claim is for intentional infliction of emotional distress,

5    which requires "(1) extreme and outrageous conduct with either the intention of, or

6    reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered

7    severe or extreme emotional distress and (3) actual or proximate causation." *Star v.*

8    *Rabello*, 625 P.2d 90, 91–92 (Nev. 1981) (citations omitted). No legitimate legal

9    justification existed for Goodman's lengthy detention and arrest, and a jury may find that

10   Defendants' conduct, supported by the weakest of explanations, rose to the level of

11   "extreme and outrageous." Again, questions of fact dominate the Court's analysis of this

12   claim, which therefore counsels against granting Defendants' request for summary

13   judgment.

14   **VI.    CONCLUSION**

15           LVMPD has developed a policy and practice of broad-scale prostitution sweeps in

16   public casinos in a manner that threatens the constitutional rights of the women they

17   target. As evidenced by Goodman's detention and arrest in February 2011, the

18   imprecise nature of Vice's undercover activity results in a chaotic atmosphere that

19   portends serious constitutional violations in cases where officers fail to appropriately

20   assess the suspicion of their targets, all without appropriate checks on individual officer's

21   actions. The Constitution requires more.

22           IT IS THEREFORE ORDERED that Plaintiff Chentile Goodman's Motion in Limine

23   (dkt. no. 74) is GRANTED.

24           IT IS FURTHER ORDERED that Defendants' Motions for Summary Judgment

25   (dkt. nos. 81 and 82) are DENIED.

26           IT IS FURTHER ORDERED that Defendants' Amended Motion to Seal (dkt. no.

27   87) is DENIED. However, the Court will temporarily suspend unsealing Segura and

28   Signorello's deposition transcripts (dkt. nos. 84-2 and 84-3) to give Defendants leave to

1   file a renewed motion to seal portions of these two transcripts that should be sealed for

2   compelling reasons. Such a motion must be filed within fourteen (14) days from the entry

3   of this Order.

4          IT IS FURTHER ORDERED that Plaintiff Chentile Goodman's Motion for Partial

5   Summary Judgment (dkt. no. 84) is GRANTED in part and DENIED in part.

6          The Court notes that the parties made several arguments and cited to several

7   cases not discussed above. The Court has reviewed these arguments and cases and

8   determines that they do not warrant discussion as they do not affect the outcome of the

9   Order.

10          IT IS SO ORDERED.

11          DATED THIS 2nd day of August 2013.

12

13

14          _____
            MIRANDA M. DU
15          UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28